[No. 24305. *En Banc.* November 7, 1933.]

*In the Matter of the Liquidation of the* FARMERS & MERCHANTS STATE BANK OF NOOKSACK.

NOOKSACK VALLEY STATE BANK, *Respondent,* v. THE STATE SUPERVISOR OF BANKING, *Appellant.*[1]

*Arthur G. Cohen* and *Simon Wampold, Jr.,* for appellant.

*Abrams, Healy & McCush,* for respondents.

STEINERT, J.—The Farmers & Merchants State Bank, of Nooksack, Washington, hereinafter spoken

of as "the Farmers bank," was closed as an insolvent bank on May 24, 1931, by C. S. Moody, the then supervisor of banking. Since that time, its affairs have been in the course of liquidation. The Nooksack Valley State Bank, hereinafter spoken of as "the Nooksack bank," presented to the supervisor of banking, hereinafter spoken of as "the supervisor," a preferred claim, in due form, for the sum of $1,920.69, against the Farmers bank, insolvent. The claim was rejected as a preferred claim, but was allowed as a general, or common, unsecured claim. The Nooksack bank then brought this action in the superior court for relief, wherein, upon a trial, findings and judgment were entered establishing the claim as preferred in the full amount demanded. The supervisor, as liquidating officer, has appealed.

The facts are substantially as follows: On May 21 and 22, 1931, the Farmers bank issued twelve drafts on the Northwestern National Bank of Bellingham, hereinafter spoken of as "the Northwestern National," in the aggregate sum of $3,764.49. Of these twelve drafts, nine, aggregating the sum of $2,118.92, were payable, two or more, to each of several banks in Whatcom county. The remaining three drafts, aggregating the sum of $1,645.57, were payable to the Federal Reserve Bank at Seattle. The Farmers bank had no arrangement for credit with the Northwestern National to take care of the drafts, other than a money credit or deposit in the sum of $198.23. For reasons which will hereinafter appear, the drafts payable to the Federal Reserve Bank do not enter into this action. The claim for $1,920.69 involved herein represents the difference between the above sum of $2,118.92 and the credit or deposit of $198.23.

The several drafts were issued to pay checks that had been given by various depositors who had suf-

ficient deposits of money in the Farmers bank at the time to cover and pay such check items, the drafts being issued after the bank had charged on its books the checks drawn by such depositors.

On May 22, 1931, it became known to certain creditors of the Farmers bank and to the banks holding the drafts above referred to, and also to the supervisor, that the Farmers bank was in an unsafe condition. In the afternoon of that day, certain of the creditors, together with the supervisor, held a meeting in Bellingham and attempted to devise ways and means by which the Farmers bank might be saved from closing its doors. Several of respondent's directors were present at the meeting, and were requested by the supervisor and by various creditors to consider arrangements whereby the bank might be consolidated with respondent so as to prevent, if possible, its insolvency and subsequent liquidation. Acting upon the then supposed financial condition of the Farmers bank, as indicated from a superficial examination of its books, the respondent's directors were considering the suggestion, and were favorably disposed toward such consolidation. A vital feature of the proposed merger was the honoring of the outstanding drafts above mentioned, to prevent their going to protest.

On the morning of May 23rd, the supervisor demanded that the drafts be taken care of at once, else the Farmers bank would have to be closed. Then, at the suggestion of the supervisor, the respondent drew its draft in the sum of $3,566.26, payable to the Northwestern National, and delivered it to the supervisor, who, in turn, delivered it to the Northwestern National for deposit to the credit of the Farmers bank. The Northwestern National then issued its several drafts in favor of the respective Whatcom county payee banks, and took up the outstanding drafts held by

them. The Northwestern National also issued several drafts, aggregating $1,645.57, to the Federal Reserve Bank at Seattle. The disposition of these latter drafts we will refer to a little later.

There is a dispute as to the understanding had between the Nooksack bank and the supervisor upon the delivery of the draft to the supervisor. On behalf of the Nooksack bank, the testimony tends to show that the supervisor then said that, if the merger of the two banks should take place, the advancement made by the Nooksack bank would be absorbed in the consolidation, but that, if it did not take place, then the money thus advanced would be a preferred claim against the assets of the insolvent Farmers bank, under the bank collection code of the state. The other version was that the supervisor advised that, under the bank collection code, drafts which had been issued in payment of checks charged to customers and outstanding in a failed bank constituted preferred claims. The trial court found in favor of the first version, and further found that the advancement by the Nooksack bank was made, not only in reliance on such statement of the supervisor, but also for the express purpose of preventing the dishonor of the drafts issued by the Farmers bank, and the effect that such dishonor would have upon the latter, and upon its depositors and creditors.

The next day, May 24, 1931, a further examination of the books of the Farmers bank revealed to the supervisor, and to the Nooksack bank, largely increased shortages and liabilities theretofore concealed through false book entries by the cashier of the Farmers bank, decidedly establishing the insolvency of that bank. Upon making this discovery, the supervisor refused to permit any further steps looking to a consolidation of the two banks, and promptly closed the insolvent

bank and proceeded to liquidate it. At that time, the three drafts payable to the Federal Reserve Bank had not yet been paid. Accordingly, after the supervisor closed the insolvent bank, he returned the amount of those drafts, $1,645.57, to the Nooksack bank. The other nine drafts having already been paid, the supervisor declined to make any reimbursement therefor.

The Nooksack bank then made claim for a preferred allowance, which was denied. This action then followed, with the result already indicated.

The bank collection code of this state provides that, when there is presented to a drawee or payor bank, for payment, an item or items drawn upon, or payable by or at, such bank, and the bank, at the time, has on deposit to the credit of the maker or drawer an amount equal to such item or items, and if such drawee or payor bank shall fail or close after having charged such item or items to the account of the maker or drawer thereof without having paid the item or items either in money or by an unconditional credit so as to make such drawee or payor a debtor therefor, then the assets of the drawee bank shall be impressed with a trust in favor of such item or items for the amount thereof, and the owner of the items shall be entitled to a preferred claim upon such assets. Laws of 1929, p. 524, § 13, subd. 2; Rem. Rev. Stat., § 3292-13, subd. 2.

The appellant contends in its brief that respondent must establish two propositions in order to sustain a recovery: first, that the holders of the drafts, that is, the payee banks, were entitled to a preference; and second, that the respondent, under the circumstances herein narrated, succeeded to such preference.

█ Upon the first proposition, it is argued that the payee banks were not *owners* of the items, but merely held them for collection, and hence were not

entitled to the preference given by the bank collection code. This question was not raised in the court below, but is made for the first time upon appeal. The trial proceeded upon the theory that the payee banks were the owners of the items. We will, therefore, consider the case upon the same theory as that upon which it was presented below. With that view, we proceed at once to the consideration of the second proposition.

Upon the second question, appellant contends that respondent must establish its claim of preference (1) by virtue of the above statute; or (2) by assignment; or (3) by subrogation. We are at this point again enabled to narrow the question somewhat, because respondent admits that it does not come "within the purview of the language of the statute entitling it to a preferred claim in its own right." It further admits that "no actual assignment of the drafts or the rights of the payee bank was taken." It bases its right to recovery solely on the theory of subrogation. So we are here limited to the question whether respondent, under any application of the doctrine of subrogation, is entitled to reimbursement for the money it advanced to pay the outstanding drafts of the Farmers bank.

The appellant's position is that, when respondent advanced the money, it was simply making a *loan* to the Farmers bank, for which it would have only a general, and not a preferred, claim; and that, in making such loan, it was acting as a volunteer, and not through any form of compulsion.

If the transaction is to be held to be a loan, it can only be on the theory that such was its legal effect. It can not be said that it was a loan in fact. There is no evidence whatever that the money was advanced as an express loan, or that it was ever so intended or regarded. The circumstances under which the parties dealt with each other all indicate the contrary. If the

supervisor had the power, by his representation to respondent, to bind the Farmers bank and its assets, then, of course, respondent's rights would now be unassailable. On the other hand, if the supervisor did not have the power to act for the bank, then the bank was not a party to the transaction at all, and therefore could not be said to have obtained a loan from respondent. Moreover, the fact that, after the closing of the Farmers bank, the supervisor returned to the respondent the amount of the three drafts issued to the Federal Reserve Bank, is very significant that the transaction was not a loan; otherwise, the supervisor would have had no right to make such return.

Subrogation is an equitable doctrine and, in its application, courts are not bound by strict legal rules. It is a device invented, and a means adopted, by equity to compel the ultimate discharge of an obligation or debt by the one who in good conscience ought to pay it. In the very nature of things, its application must depend upon the facts and circumstances of the particular case. The doctrine has various phases, but its essential characteristics are preserved throughout. It is founded upon the generally accepted maxim that no one shall be enriched by another's loss, and it will be invoked whenever justice demands its application. 25 R. C. L. 1312-1314. The various classes of cases in which the doctrine of subrogation will be applied are discussed in 25 R. C. L. 1322 *et seq.* as follows:

"Since the doctrine of subrogation was ingrafted on English equity jurisprudence, it has been steadily expanding and growing in importance and extent in its application to various subjects and classes of persons. The original limitation of the right to transactions between principals and sureties no longer exists, and the doctrine as now applied is broad enough to include every instance in which one person, not acting voluntarily, pays a debt for which another is primarily

liable, and which in equity and good conscience should have been discharged by the latter. Subrogation not being a matter of strict right, but purely equitable in its nature, dependent upon the facts and circumstances of each particular case, no general rule can be laid down which will afford a test in all cases for its application. Generally speaking, however, those who will be granted subrogation may be divided into four classes: First, those who pay the debt to another in the performance of a legal duty imposed by contract or the rules of law. Second, those who pay the obligation of another for the purpose of protecting their own rights or interests. Third, those who pay the debt of another under an agreement for subrogation to the right of the creditor. Fourth, those who pay on the invitation of the public and whose payment is favored by public policy.''

5 Pomeroy's Equity Jurisprudence (2d Ed.), § 2344, is to the same effect.

Applying these rules to the facts in this case, it is apparent that respondent does not fall within the first class.

Viewing the evidence from the standpoint of the second class, it may fairly be said that the respondent had a very decided interest to protect in advancing the money to the supervisor. At his instance, and with his consent, the respondent had made preliminary arrangements for consolidation with the Farmers bank. Only a final audit by the state banking department remained to complete the consolidation. To effect the merger, it was, of course, necessary that the Farmers bank be kept open for business until the actual consolidation was effected. This, in turn, necessitated the advancement of the funds by the respondent to take up the outstanding drafts. Under these circumstances, the respondent could not be said to be an intermeddler or a mere volunteer. Its act in ad-

vancing the money was necessary to support the interest which it had in the ultimate transaction.

■ Considering the evidence from the angle of the third class, respondent paid the debt of the Farmers bank under what we think must be taken to be an agreement for subrogation to the rights of the payee banks. It is true that there was no express agreement that the liens of the payee banks should be kept alive or that they should be assigned to respondent. But it is not necessary that there be an express agreement to that effect. If it can be clearly implied from all the facts and circumstances of the particular case that it was the intention of the parties that the person making the advancement was to have security of a dignity and position equal to that which his advancement discharged, equity will decree him such security.

"In such cases equity, speaking from the standpoint of good conscience, substitutes the person so paying the debt to the place of the original creditor, so far as to enable him to enforce the security for the purpose of reimbursement." 25 R. C. L. 1340.

*Federal Land Bank v. Hanks,* 123 Kan. 329, 254 Pac. 1040; *Platte v. Securities Investment Co.,* 55 S. W. (Tex. Com. App.) (2d) 551.

There can be no question in this case, under the findings of the court, that it was the intention of the parties concerned in the transaction that respondent was to have a preferred claim to the same extent that the payee banks had.

■ Finally, we think that respondent also falls within the fourth classification of those entitled to the benefits of subrogation, that is, those who pay on the invitation of the public and whose payment is favored by public policy. The attempt to consolidate the two banks was obviously intended for the welfare and pro-

tection of the general public. Its purpose was to obviate the very thing that later occurred, namely, the insolvency of the bank, the consequent loss to its depositors, and the natural effect upon the community in which the bank was located. The officers of the respondent conceived it to be their moral duty, at least, to lend their assistance to a plan which, if perfected, would enable the Farmers bank to continue to function. The respondent, therefore, could not be said to be a stranger or mere volunteer injecting itself into a situation in which it had no concern.

"A mere volunteer, it is generally agreed, is never entitled to subrogation. The term is used to designate one who, acting upon his own initiative, pays the debt of another without invitation, compulsion, or the necessity of self-protection." 5 Pomeroy's Equity Jurisprudence (2d Ed.), § 2348.

Respondent was not "a mere volunteer" under this definition. It was acting upon the invitation of the supervisor, who, in turn, was trying to protect the public.

This phase of the rule is most frequently applied to protect a purchaser at void judicial and quasi-judicial sales. The reason for the application of the rule in such cases is that such purchases should be encouraged, by giving equitable relief to the purchasers

". . . whose money has been honestly applied to the purposes to which the property has been devoted, although on account of the insufficiency of the proceedings they have failed to obtain title." 25 R. C. L. 1356.

Inasmuch as the interests of many persons would be affected by the failure of a bank, an honest endeavor to protect such bank against insolvency proceedings is to be encouraged. Encouragement would not be fur-

thered, however, if the person who offers assistance were penalized by the loss of that which he innocently and from good motives advances.

The depositors of the Farmers bank will not be in any worse condition by reason of the allowance of the present claim as preferred than they would have been if respondent had not made the advancements at all. So far as they are concerned, the situation is the same. The depositors, therefore, can not expect a gratuitous enrichment of the bank's assets built solely upon respondent's loss. Every reason, it seems to us, dictates the allowance of the claim as preferred; no valid reason, we think, militates against it.

The judgment is affirmed.

BEALS, C. J., TOLMAN, HOLCOMB, and GERAGHTY, JJ., concur.

MITCHELL, J. (dissenting)—I dissent. It is essential, of course, in deciding this case, to understand the intention of the parties and the effect of the transaction by which the Nooksack bank, through Mr. Hamm, its cashier and manager, delivered to Mr. Moody, the supervisor, its draft on a Seattle bank, payable to the Northwestern National Bank of Bellingham, to be delivered to the latter bank by the supervisor on May 23, 1931, to take care of outstanding drafts issued by the Farmers bank.

Mr. Hamm of the Nooksack bank, Mr. Stone, cashier, and other directors of the Farmers bank, and the supervisor, were in all of the conferences to and including the one at which the Nooksack bank decided to furnish the money. Mr. Hamm, testifying with reference to his delivering the draft to be delivered to the Northwestern National Bank, said:

"Q. It was your understanding it would be credited to the account of the Farmers & Merchants Bank? A. Yes, sir."

Mr. Moody testified:

"Q. When he [Mr. Hamm] gave you the draft on Saturday morning, it was payable to the Northwestern National Bank. What did you do with the draft? A. I took it down and gave it to the Northwestern. Q. What did they do with it? A. They credited it to the Farmers & Merchants Bank. Q. They didn't return to you the remittance drafts? A. No."

Manifestly, the transaction was a loan to the Farmers bank—so intended and understood by all the parties. Nor did the fact that a part of it, intended to pay outstanding drafts in favor of the Federal Reserve Bank in Seattle, was not used for that purpose because those drafts were not presented for payment, deprive that which was used and that is involved in this action of its character as a loan.

In consonance with this theory is the admitted fact that the outstanding drafts that were taken up by the Northwestern National Bank were paid by the money furnished on behalf of the Farmers bank, and the drafts thus taken up and cancelled were forwarded to and received by the Farmers bank prior to the closing of its doors for the transaction of business. Respondent bank did not expect the cancelled drafts to be returned to it.

That is all there is to this case. The respondent bank became nothing more than a common creditor— one who had loaned money to, and for the benefit of, the insolvent bank.

Nor can the judgment appealed from be sustained upon the principle or equitable doctrine of subrogation, under the rules relied on as they are mentioned in Ruling Case Law and Pomeroy's Equity Jurisprudence. When respondent supplied funds to the credit of the Farmers bank, the respondent had no interest whatever to protect. It was a mere volunteer. It was

under no legal or moral obligation to merge with the Farmers bank, and could have dropped the scheme of merging without advancing any money and without incurring any liability whatever. The supervisor had no power or authority to bind the Farmers bank or its assets, because that bank was still open and doing business, and, indeed, the supervisor has at all times since the closing of the bank, including his appeal to this court, taken the position that the respondent bank had no right whatever other than that of a common creditor.

If it shall be held, as suggested in the majority opinion, that the respondent is entitled to be subrogated to the rights of the holders of the outstanding drafts of the Farmers bank, that would not give it any preference over common creditors. The holders of those drafts had no liens or preferred claims against the Farmers bank or its assets at any time. Nor would they have had any if they had still held the drafts when the Farmers bank closed its doors. The substance of the transaction in this case in this respect centers about the holding in the majority opinion that:

"There can be no question in this case, under the findings of the court, that it was the intention of the parties concerned in the transaction *that respondent was to have a preferred claim to the same extent that the payee banks had.*"

The words italicized refer to what I fear has been confusing. As already stated, the payee banks had no *preferred* claims. The Farmers bank did not give, nor attempt to give, them any. The supervisor gave them none. The controversy at the trial, as to any representations made by the supervisor to the respondent bank as to its legal rights upon advancing money, whether according to his or its version of those representations, was immaterial. That controversy related

to a pure matter of law upon a subject concerning which the supervisor had no more power of binding the assets of the Farmers bank at that time than any other person.

Nor did the holders of the drafts have any *preferred* claim under the statute, Rem. Rev. Stat., § 3292-13 (2); nor would they have had any preferred claim had they held the drafts at the time the bank closed. The statute referred to in this case, reads:

"2. Except in cases where an item or items is treated as dishonored by non-payment as provided in section 3292-11, when a *drawee or payor bank* has presented to it for payment an item or items drawn upon or payable by or at such bank and at the time has on deposit to the credit of the maker or drawer an amount equal to such item or items and such *drawee or payor shall fail or close for business* as above, after having charged such item or items to the account of the maker or drawer thereof or otherwise discharged his liability thereon but without such item or items having been paid or settled for by the drawee or payor either in money or by an unconditional credit given on its books or on the books of any other bank, which has been requested or accepted so as to constitute such drawee or payor or other bank debtor therefor, *the assets of such drawee or payor shall be impressed with a trust in favor of the owner or owners of such item or items for the amount thereof, or for the balance payable on a number of items which have been exchanged, and such owner or owners shall be entitled to a preferred claim upon such assets,* irrespective of whether the fund representing such item or items can be traced and identified as part of such assets or has been intermingled with or converted into other assets of such failed bank." (Italics mine.)

Obviously, that statute is not applicable here, because it was not the *drawee or payor bank* but the *maker or drawer bank* that *failed or closed for business.*

It follows, therefore, that, if the respondent be allowed a claim *to the extent that the payee banks had,* it would be nothing more than a common claim, which is the character or rank in which it was considered and allowed by the supervisor, but for a different and proper reason.

Nor is the respondent entitled to be ranked as a preferred creditor by subrogation on the score of advancing money on the invitation of the public, entitling it to be favored as a matter of public policy. No such doctrine is applicable here. Public policy is neither concerned with nor involved in the matter of a merger with an insolvent bank, nor in giving, in the name of subrogation, a preference right to one who advances money to such insolvent bank to take up the claims of some of its common creditors; and even in void judicial sales cited in the majority opinion as falling within this doctrine (25 R. C. L., pp. 1322, 1356), no preference is given to the purchaser beyond or above the extent or class of the right or security to which his money was applied—not a preferred or superior claim in lieu of a common one.

To emphasize my views of error in the judgment appealed from and to take issue with it, I refer to two statements near the close of the majority opinion. It is said that the depositors of the Farmers bank will not be in any worse condition by giving the respondent preference than they would have been if the respondent had not advanced any money at all. This conclusion, in my opinion, is wrong. The Farmers bank is and was insolvent, and if its drafts had still been outstanding when the bank closed, the holders thereof would have been common creditors only and entitled to less of the assets of the Farmers bank than is now awarded to the respondent bank as a preferred

creditor. The preference given unduly reduces the assets otherwise available for the common creditors.

Still further, it is said: "The depositors, therefore, can not expect a gratuitous enrichment of the bank's assets built solely upon respondent's loss." Of course not; nor should the respondent bank expect or be given an advantage as a preferred creditor in the bank's assets, enriched by deposits, made in the utmost good faith, by the farmer, the grocer and the laborer, presumably on the same day the respondent bank advanced money to the credit of the Farmers bank to meet paper the Farmers bank had issued in payment of, and upon the faith of, checks drawn upon it by other of its depositors and common creditors.

MAIN, MILLARD, and BLAKE, JJ., concur with MITCHELL, J.