Argued January 7, reargued May 11, reversed May 25, 1960

# HULT *v.* EBINGER
## 352 P. 2d 583

C. S. Emmons, Albany, argued the cause for appellant. On the brief were Long and McKechnie, Albany.

Francis E. Marsh, McMinnville, argued the cause for respondent. On the brief were Marsh, Marsh and Dashney, McMinnville.

Before McALLISTER, Chief Justice, and ROSSMAN, WARNER, PERRY, SLOAN, O'CONNELL and GOODWIN, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff, Fannie Trimble Pedrioli Hult, formerly Mrs. Vitale Pedrioli, from a decree of the circuit court which denied her prayer to charge the real property received by the defendant, John B. Ebinger, from the estate of W. J. Ward, deceased, with the amount of money which the plaintiff alleges she paid to the Bank of America in 1946 in satisfaction of a promissory note payable to it which W. J. Ward had signed as maker September 16, 1931. Ward died March 28, 1936, and there remained unpaid upon the note on that day $1,657.88. One Vitale Pedrioli, to whom we will hereafter refer as Vitale, had signed the note as endorser. He and the plaintiff became married May 22, 1934, and the two remainded husband and wife until Vitale's death October 22, 1939. The defendant received a conveyance of the real property of the estate February 20, 1951, in consideration of his agreement to pay all claims against the estate which the executrix had approved. The defendant admits that the bank had filed a claim in the amount of $1,700 against the estate, based upon the note just mentioned, and that the executrix of the estate had approved the claim prior to the time that he (the defendant) had agreed to pay all of the approved claims. The defendant also admits that neither he nor the estate ever paid any part of the claim. The denomination of the note which Ward, as maker, and Vitale, as endorser, signed September 16, 1931, was $2,600. As we said, $1,657.88 remained unpaid at the time of

Ward's death in 1936. The difference between $2,600 and $1,657.88 was the amount that Ward had paid upon the note during his lifetime.

In 1939 the plaintiff was adjudged an involuntary bankrupt by the United States District Court for southern California. June 5, 1942, the bank filed with the court just mentioned an assignment of its claim against the Ward estate which named as assignees Fannie Trimble Pedrioli and Vitale Pedrioli. By that time Vitale had died. His death occurred in 1939. The plaintiff testified that when the bank filed the assignment it was agreed that the instrument was to become hers when the bank's claim was paid. No other testimony upon that subject was given by any one. The plaintiff swore that in 1946 her estate in bankruptcy discharged in full the unpaid balance due upon the note. In part substantiation of the assignment the plaintiff introduced in evidence (1) a certified copy of the assignment which was on file with the bankruptcy court and (2) a certified copy of the final order of the bankruptcy court which discharged her. Both were received in evidence. The final order declared that all allowed claims had been paid in full and that a surplus of $8,648.77 remained on hand after the payment of all claims and costs of administration. The order directed the payment of the surplus to Mrs. Pedrioli (this plaintiff). We have mentioned the fact that the plaintiff's deceased husband was liable secondarily only upon the note and that the defendant, for a valuable consideration, had agreed to pay all claims against the Ward estate that the executrix had approved. Since the executrix had approved the bank's claim and since the plaintiff swore that her estate in bankruptcy had discharged the unpaid balance of the note, the plaintiff contends that she is entitled to judg-

ment against the defendant. She claims that she is entitled to proceed against the defendant under the assignment from the bank and also under the rules governing subrogation.

The defendant, in contending that he owes the plaintiff nothing, concedes that neither he nor the Ward estate has paid (1) the balance that remained due upon the note which Ward, as maker, signed in 1931 or (2) the claim based upon the note which the bank filed with the executrix. Since Ward was the maker of that note the duty of paying it was upon him as long as he lived and it became that of his estate when he died. The duty of paying the claim became the defendant's when on February 20, 1951, he received all of the remaining assets of the estate and agreed in consideration of the conveyance to pay all of the approved claims. In order to justify his refusal to pay the claim the defendant's brief submits the following propositions:

"Photostatic copies of writings are not admissible in evidence if the original writings are available and can be produced."

"The plaintiff failed to prove by competent evidence that the claim filed by the Bank of America with the estate of W. J. Ward, deceased, had been assigned to her."

"The plaintiff was guilty of laches in failing to assert her claim against the defendant."

"The plaintiff should be estopped from asserting her claim against the defendant because of representations made in her affidavit and complaint in the case she brought against the Bank of America, wherein she stated that the note of the bank had been paid or was a forgery."

The first two of those propositions refer to the fact that the plaintiff, in establishing the assignment

of the bank's claim to her, presented a copy of the assignment which the bank filed with the bankruptcy court June 5, 1942. The copy was duly certified by the clerk of the court as a true copy.

January 31, 1938, Vitale and the plaintiff, who became his wife in 1934, executed and delivered to the bank a note in the sum of $5,359.32 which amount was made up in part of the unpaid balance of the note which Ward, as maker, and Vitale, as endorser, signed September 16, 1931. When this new note was signed and delivered to the bank the latter kept and did not surrender the note of September 16, 1931. In the manner just stated the plaintiff, who had not signed the note of September 16, 1931, rendered herself liable to discharge its unpaid balance. The Pedriolis secured the payment of the note of January 31, 1938 ($5,359.32) by a mortgage which described an item of property which they owned and which was known as Chetco Inn.

A letter which the defendant wrote to the plaintiff February 1, 1945, states the reasons which induced her to sign the new note of January 31, 1938, in the denomination of $5,359.32. Before quoting the pertinent part of the letter we take note of the fact that the defendant is a capable practicing attorney who, before writing his letter of February 1, 1945, made a careful study of the Ward estate. The following is taken from his letter:

> "I have made a full investigation of what has transpired in the handling of said estate and of the value of assets involved, which has taken some time. In the course of the investigation, I came across the claim of Bank of America filed by its Crescent City branch on promissory notes aggregating $1742.00, the balance of a $2600.00 note and an $84.00 note. * * * I learned that when the Bank did not realize on its claim filed against the

Ward estate it insisted upon payment from you and made it necessary for you to assume the balance of said note and required you to give the Bank a mortgage on the Chetco Inn property. I have also been informed that by reason of this and other things, you were required to take bankruptcy, and that your bankruptcy matter is still pending.

"When you mortgaged your property to the Bank and cleared out the Ward estate on its obligation on the note, you became subrogated to the rights of the Bank against the Ward estate and legally were 'placed in the shoes' of the Bank, insofar as its claim filed in the Ward estate was concerned, and when you took bankruptcy, this claim became an asset of your bankruptcy estate, and the trustee appointed in bankruptcy succeeded to your rights against the Ward estate."

We saw in the excerpt quoted in a preceding paragraph of this opinion that the defendant claims that the plaintiff has been guilty of laches and that she should be deemed estopped from asserting her claim against the defendant. The basis of the defense of estoppel is thus stated in the afore-mentioned excerpt:

"* * * because of representations made in her affidavit and complaint in the case she brought against the Bank of America, wherein she stated that the note of the bank had been paid or was a forgery."

We shall now state the basis of that contention.

In 1935 the Bank of America instituted an action in the circuit court of this state for Curry County upon the $2,600 note signed by Ward, as maker, and Vitale, as endorser. In that action only Vitale was made a defendant although Ward was still living. November 13, 1935, the bank obtained a default judgment against Vitale. Thereafter, the bank never employed that judgment for any purpose, and it will be

observed that it even ignored it when it filed its claim against the Ward estate. August 13, 1948, at least two years after the plaintiff had been discharged from bankruptcy and had paid, according to her contentions, the bank's claim, she filed a suit in Curry County which asked the court to set aside the default judgment which the bank had obtained against her husband November 13, 1935. By that time Vitale had died. In that complaint she alleged:

"* * * That plaintiff, Fannie Pedrioli has been informed and believes and basing her allegation on those grounds alleges that the said Berniece Ward as executrix of the estate of W. J. Ward, deceased, paid the amount of the unpaid balance on said promissory note which was incorporated into the first cause of action of complaint Number 1319 filed in the Circuit Court of the State of Oregon for the County of Curry."

It will be observed that the averment to the effect that the executrix had paid the note was made with the explanation that the plaintiff "has been informed and believes."

No averment was made by the plaintiff in the suit for the cancellation of the default judgment that the note was a forgery. The nearest that the plaintiff came to alleging anything of that character was a statement that when the bank secured the default judgment it did not tender to the court the original note but only a typewritten copy. She also alleged that when the action was filed Vitale was under guardianship as incompetent and that she was confined in a Los Angeles hospital as the result of severe injuries incurred in an automobile accident.

The foregoing is the basis of the estoppel and laches. It is based upon the proposition that when the

plaintiff alleged upon information and belief that the Ward estate discharged the unpaid balance of the note the defendant was misled. There can be no foundation for a belief of that kind. We mentioned the fact that the defendant is a seasoned member of the bar. Before accepting a conveyance of the remaining assets of the estate and agreeing to pay all approved claims he made a thorough analysis of the estate. All claimants, with the exception of the plaintiff and two or three claimants whose addresses were unknown and whose claims were for small sums, had employed him to collect their claims. Before accepting a conveyance of the properties he had endeavored to persuade the executrix, (Ward's widow), to take action whereby the estate would secure sufficient funds to pay the claims, but had failed. No one knew the affairs of the estate better than he. The following is taken from defendant's testimony:

"Q In your examination of the records of the estate, did you find anything indicating that the Bank of America had ever been paid anything.

"A Will you repeat the question.

"Q I say, in your examination of the estate filed [files], did you ever find where the Bank of America had been paid by the estate?

"A I found nothing and I don't think there is anything in the estate file that shows the Bank of America claimed to have been paid.

\* \* \*

"Q Mr. Ebinger, what about the claim of the Bank of America, that had been approved, had it not?

"A It had been allowed back there in '37, yes.

"Q And, there was nothing in the record indicating it had been paid, was there?

"A Not a thing in the record that it had been paid, no."

In addition, the defendant testified freely that the estate had paid none of the claims that had been filed. There can be no basis for a belief that the defendant was misled by the plaintiff's complaint against the bank.

Since the defendant admits that he accepted a conveyance of all the real property owned by the estate as consideration for his promise to discharge all claims filed against the estate which the executrix had approved, we deem it pertinent to take note of the following testimony which he gave:

"Q  Mr. Ebinger, did you ever pay any money to the Bank of America on the claim that was filed against the Ward estate?

"A  I have not.

"Q  In your examination of the records of the estate, did you find anything indicating that the Bank of America had ever been paid anything?

"A  Will you repeat the question.

"Q  I say, in your examination of the estate filed [files], did you ever find where the Bank of America had been paid by the estate?

"A  I found nothing and I don't think there is anything in the estate file that shows the Bank of America claimed to have been paid."

The controlling issues in this case, according to our belief, are (1) did the plaintiff, in the course of the bankruptcy proceeding, discharge the unpaid balance of the $2,600 note which Ward signed September 16, 1931, and (2) if the plaintiff paid the note did she become the assignee through written instrument or by operation of law of the bank's rights against the Ward estate.

The evidence upon those two issues is not as ade-

quate as one might wish it to be, yet it would be extraordinary if the bank was not paid in full in the bankruptcy proceeding. A preceding paragraph of this opinion takes an excerpt from the defendant's letter to the plaintiff in which he mentioned the diligent manner through the years in which the bank pursued the Pedriolis for payment of the note. In his letter from which the excerpt was taken the defendant mentioned that the plaintiff was forced to mortgage her property to the bank and added:

> "* * * I have also been informed that by reason of this and other things, you were required to take bankruptcy."

It is manifest that the bank was fully informed of the bankruptcy because it will be recalled that it filed in that proceeding an assignment to the plaintiff of its rights against the Ward estate and directed that when its note was paid the assignment should be delivered to the plaintiff. Thus, the bank expected to receive payment of its note through the bankruptcy court. It would be most remarkable if, after the bank had maintained its long continued insistence upon payment which even "required [the plaintiff] to take bankruptcy" (the quoted words are the defendant's), it failed to file a claim in the bankruptcy proceeding and failed to obtain payment in full. We must not forget that the bankruptcy proceeding yielded a surplus of $8,648.77 which was paid to the plaintiff. But we need not rest this case upon speculation, even though the speculation has a good foundation in every-day observation.

We have mentioned the fact that June 5, 1942, the bank filed with the bankruptcy court an assignment of its claim against the Ward estate and that the in-

strument named as assignees the two Pedriolis. The instrument was prepared and signed while Vitale Pedrioli was still living. Before it was delivered to the bank Vitale had died. When that instrument was filed with the bankruptcy court the balance due upon the note had not been paid. Since the Pedriolis were liable upon the note only secondarily as endorsers, the bank obviously realized that if the plaintiff paid the note she would become entitled, through subrogation, to the bank's rights to the Ward estate. Seemingly, for that reason, the assignment which we have mentioned was prepared and was filed with the bankruptcy court. We repeat that the very fact that the bank filed the assignment with the bankruptcy court indicates that it looked forward to the receipt of payment through the bankruptcy.

■ The paper which the plaintiff offered as the assignment was not the original but was a photostatic copy of it which bore a certificate signed by the court's clerk and also the seal of the court. The certificate certified that the paper was a true copy. No one challenges the seal, the sufficiency of the certificate or the phraseology of the assignment. The evidence indicates that the bank officials (Assistant Vice President and Assistant Secretary) who executed the assignment were duly authorized to take that course. ORS 43.110 renders the copy of the assignment admissible in evidence. We have mentioned the fact that the copy was actually received in evidence. However, the copy does does not establish in itself that the bank filed a claim upon the note and that the claim was paid.

May 31, 1946, as we have said, the United States District Court which administered the plaintiff's bankruptcy estate entered its final order which discharged her. That order recited that all claims had been paid

and that after the costs of administration had likewise been met a balance of $8,648.77 remained on hand. The order directed that that balance should be paid to the plaintiff. The order stated in part:

"* * * and it appearing to the Court that the petitioner has in all respects cooperated with the Court in disclosing all of her assets and all of her known liabilities so that proper disposition thereof might be ascertained and dealt with by this Court; that all provable claims against petitioner or her estate have either been allowed or otherwise disposed of, and those that have been allowed have been fully paid, and such as have not been allowed have been otherwise disposed of; that Ignatius F. Parker, the Disbursing Agent duly appointed by this Court herein, has in his possession certain cash funds out of which he has heretofore been ordered to pay to the attorneys for said Fannie Trimble Pedrioli certain sums of money and that he be paid for his services as claimed by him in his Final Report, and that after all these claims have been paid, including cost of administration, there will still remain in the hands of said Disbursing Agent the net sum of $8648.77.

"IT IS HEREBY ORDERED that Ignatius F. Parker, the Disbursing Agent herein, turn over and pay to the petitioner said amount and turn over to her all papers and documents in his possession in connection with or in any way appertaining to the right, title and interest of the petitioner in and to any of her properties. And the Court further finds that the petitioner is entitled to the relief prayed for in her said petition; and that she should be forthwith relieved, released and discharged from any further supervision, control or custody of any of her properties by this Court, and that the estate is now in a condition to be closed.

"IT IS THEREFORE FURTHER ORDERED, ADJUDGED, AND DECREED that Fannie Trimble Pedrioli be, and herewith is henceforth,

relieved, released and discharged from any further control, supervision or custody of her properties and each and every part or portion thereof; that said Fannie Trimble Pedrioli be, and herewith is, declared to be the beneficiary and the rightful owner of any claim or claims that have been duly and regularly heard and established by this Court and determined to belong to her or her said estate;

"IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that said Fannie Trimble Pedrioli be, and herewith is, reinvested with all the rights of ownership and control of and over her property which she owned and was possessed of at the time of the institution of the bankruptcy proceeding against her, save and except such properties as may have been sold or otherwise disposed of with the approval of this Court during the administration of this estate; and it now appearing to the Court that said Ignatius F. Parker has turned over to the petitioner the above mentioned sum together with all papers and documents in his possession relating to the title to any property in which he in any way participated by receiving, collecting, or paying any money in connection therewith; and it further appearing that the estate is now in a condition to be finally wound up and closed,

"IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the estate be, and herewith is, declared wound up and closed."

The order of the court just quoted, of course, establishes that the bank's claim, if filed, was paid, but the question remains, was it filed. The record contains unchallenged and uncontradicted evidence which shows that the bank filed in the bankruptcy matter its claim upon the note. The plaintiff, as a witness, after describing some phases of the bankruptcy proceeding, gave the following testimony:

"Q And, as I understand your answers to Mr. Marsh' questions, well, first let me ask you this.

Was there a claim in bankruptcy proceedings filed by the Bank of America?

"A Yes.

"Q And, they were paid from the bankrupt's estate?

"A That's right.

\* \* \*

"Q When did you pay the bank?

"A In '46 I completed it.

"Q And, you said you paid this note and another note?

"A It was two notes together and all the costs, yes, I paid.

"Q Do you remember what the two notes amounted to in all, that you paid?

"A They started in, in the amount of—after the costs were added, to five thousand three hundred fifty-nine dollars and some cents in 1939.

\* \* \*

"Q What happened with the twenty-six hundred dollar note that you were talking about in the complaint?

"A They put the twenty-six hundred dollar note together to the Wade note and lumped them as one amount, which came to five thousand three hundred fifty-nine dollars and something.

\* \* \*

"Q (By Mr. Marsh) Was there a note in the amount of five thousand and some odd dollars made up of the Ward note and the Wade note?

"A There was a claim put in for that amount.

\* \* \*

"Q All right. Now from January 31, 1938, did you pay anything on this amount on this note?

"A No.

"Q And, did you pay it all up at one time?

"A Yes.

"Q And, that was in 1946?

"A It was all paid by 1946. I don't recall just how much, how it came up, but I had it cleared in '46."

The testimony just quoted was unchallenged and uncontradicted. No objection was made to its admissibility and no contradictory evidence was offered. In fact, the record warrants a belief that during the trial no one claimed that the bank had not filed a claim in the bankruptcy proceeding. The fact that it had filed a claim was evidently taken for granted. No imagination is needed to supply a basis for a surmise of that kind.

November 15, 1956, the defendant compiled a computation of the results that he had achieved through his acceptance of the estate's properties and his agreement to discharge all of the approved claims. One of the entries in the compilation states:

"The attached list of claims against the W. J. Ward estate does not include the claim of Bank of America in the sum of $1,742.09, this claim having been 'otherwise paid' at the time of the purchase by Ebinger of the equity of redemption in the above described estate real property. The sale of the equity redemption to Ebinger was on the premise of satisfying 'all valid subsisting claims now filed against said estate not heretofore otherwise paid, satisfied or discharged.' The claim filed by Bank of America having been otherwise paid was not a valid subsisting claim against the Ward estate at the time of the transfer to Ebinger."

Thus, the defendant conceded that the claim was paid before he agreed to discharge all approved claims. He seems now to suggest that his reference to "otherwise paid" was to the averment by the plaintiff in her

suit against the bank that she had been informed that the Ward estate had paid the bank's claim. It is impossible to accept that suggestion because, as is evidenced from the defendant's testimony which is quoted in a preceding paragraph, he was fully aware of the fact that the estate had never paid anything whatever upon the bank's claim. He so testified without equivocation. The quotation which we just made from his compilation invites a holding that he was not required to make any reimbursement because payment of the note was made before he took over the estate's assets. That contention must be rejected because when he took over the assets the bank's claim was on file with the executrix and he was well acquainted with that fact. The following is taken from his testimony:

"Well, Mr. Ebinger, at the time the petition was presented to convey to you this equity of redemption, you had knowledge of the claim of the Bank of America, did you not?

"A Yes, I knew that the Bank of America had filed a claim back in 1936 or '37 when Mr. Ward died and their claim was there with fifty others."

■ We believe that all of the foregoing establishes that (1) the bank filed a claim in the bankruptcy proceeding upon the note under consideration and (2) the claim was paid in full.

We think that regardless of whether the aforementioned assignment, together with the plaintiff's testimony that she paid the Ward note, was capable of transferring to her the bank's claim against the Ward estate, the facts reviewed in preceding paragraphs show that the claim became hers through the operation of law. The principle of jurisprudence that effected the transfer is the equitable doctrine of sub-

rogation. When she paid the note the plaintiff became subrogated to the bank's rights. We will now take note of a few of the authorities.

The following is taken from Restatement of the Law, Security, § 141:

> "Where the duty of the principal to the creditor is fully satisfied, the surety to the extent that he has contributed to this satisfaction is subrogated
> (a) to the rights of the creditor against the principal, and * * *."

Comment "a" which follows the above says in part:

> "* * * Where the surety performs so that he satisfies the duty of the principal to the creditor, or where a combination of performance by principal and surety satisfies the principal's duty, the principal's duty although discharged so far as the creditor is concerned, is kept alive against the principal or, subject to equitable limitations, against others, for the benefit of the surety. Equity, in effect, creates in the surety who has performed, rights similar to those of the creditor before the duty to him was discharged. This is sometimes called an assignment by operation of law. It does not depend upon an actual assignment * * *."

We quote the following from Simpson on Suretyship, § 47, page 205:

> "Upon his payment of the principal's debt, the surety has the right to be substituted to the position of the creditor whom he pays. This is known as the surety's right of subrogation. Whether or not the surety upon payment has taken an assignment from the creditor of the latter's rights, equity will treat him as an assignee. Subrogation is equitable assignment. The right comes into existence when the surety becomes obligated, and this is important as affecting priorities * * *."

The following is taken from *Dunlop v. James,* 174 NY 411, 67 NE 60:

"* * * In modern times courts of law have dealt with subrogation as they would with assignments, and, when the right of action to which the plaintiff asks to be subrogated is a legal right of action, a court of law may treat a plaintiff who is entitled in equity to subrogation as an assignee, and allow him to maintain an action of a legal nature upon the right to which he claims to be subrogated. * * *"

This court is in accord with the rules expressed in the authorities from which we have just quoted. For example, *Watson v. McLench,* 57 Or 446, 110 P 482, 112 P 416, states:

"When, as surety, Mrs. McLench gave to the holders of the promissory notes the sum respectively due each, the payment discharged an obligation which she had assumed, whereupon the instruments were, in effect, assigned to her, authorizing an action to be maintained against her son as the principal."

In *Marsters v. Umpqua Oil Co.,* 49 Or 374, 90 P 151, Mr. Chief Justice ROBERT BEAN ruled:

"A contention is also made that, because the plaintiff was surety on the note to the bank, the assignment of such note to him was, in effect, a payment and discharge thereof. The note on its face disclosed, and the evidence shows, that he was but a surety, and was therefore entitled, upon payment of the debt, to be subrogated to all the rights of the creditor as against his principal, and entitled to foreclose the mortgage given to secure the payment of such note."

It is clear from the foregoing that the plaintiff's right to recover against the defendant is not depend-

ent solely upon the production by her of a written assignment from the bank. The rule set forth in the above authorities assigned to the plaintiff as a matter of law the bank's rights against the Ward estate provided she did not make her payment of the Ward debt as a pure volunteer.

■ It is a commonplace of English and American law that a "volunteer" is not entitled to subrogation in equity. The rule has been recognized in Oregon. *Wasco County v. New England Equitable Ins. Co.,* 88 Or 465, 172 P 126, LRA 1918D 732, Ann Cas 1918E 656 (1918); *United States Fidelity & Guaranty Co. v. Bramwell,* 108 Or 261, 217 P 332, 32 ALR 829 (1923); *McBride v. McBride,* 148 Or 478, 36 P2d 175 (1934). However, it is easier to state the rule than to apply it, and upon a closer view it becomes apparent that plaintiff is not the kind of "volunteer" to whom subrogation would ordinarily be denied.

The difficulties of the "volunteer" rule are summarized in Osborne, Mortgages, § 280, p 788:

"The origin of the volunteer rule is doubtful and both its rationale and limits are a matter of dispute. It has been asserted that, whenever courts for any reason deny subrogation, they characterize the unsuccessful applicant as a volunteer. Even when used with more discrimination, it still is frequently not clear whether it means that the plaintiff did not intend any legal consequences to flow from his act, e.g., he intended a gift, or that his intervention was unsolicited and therefore officious. Usually it is the latter and this seems to be the present tendency. But whether expressed in terms of volunteer or officious payor, there is an absence of precise content. And a critical examination of the reasons offered for using the rule to deny subrogation on payment of a creditor by a third person have revealed them to be so lacking

in force as to make reasonable the suggestion that, in order for such a payment to be officious, it must be unnecessary and confer no benefit. * * *"

Osborne concludes that the rule "is of dubious value as a guide for denying the relief and of no worth as a guide for granting it." Another commentator has summarized the authorities in the following way:

"A minority of courts is prone to call everyone a volunteer who was not in the position of a surety or who did not have some previous interest to protect in the subject matter in question. At the other extreme, the liberal view leads to the result that the only volunteer would be one who, without an invitation from any other party and purely as a philanthropist, relieved another from an obligation." Note, 34 Yale L J 683 (1939).

This court has recognized that the modern tendency is to expand the remedy of subrogation. *Wasco County v. New England Equitable Ins. Co.,* supra. See Hope, "Officiousness," 1929, 15 Cornell L Q 25; Note, "Subrogation and the Volunteer Rule," 1938, 24 Va L Rev 771; Note, 1948, 32 Minn L Rev 183.

It has been suggested that the origins of the "volunteer" rule are in the individualistic bent of the English national character and in the common law regard for privity of contract. Hope, op cit, 15 Cornell L Q 25, 29. The rule has been traced to the case of *Grymes v. Blofield,* Cro. Eliz. 541 (1598) which held that a debt could not be satisfied by a stranger, and more generally to the fear of champerty and maintenance which found expression in the early common law restricting the assignability of choses in action. Note, 1938, 24 Va L Rev 771. It is obvious that the modern practice which permits free alienability of choses has robbed the "volunteer" rule of much of its rational justification.

■ Without attempting to discuss the many exceptions carved from the "volunteer" rule, we find it enough for our purposes to note that the rule does not apply to one who pays a debt in order to protect some legal interest of his own, although not bound for the debt either as principal or surety. *Cole v. Malcolm,* 66 NY 363 (1876) (Earl, J.); *Gerseta Corporation v. Equitable Trust Co. of New York,* 241 NY 418, 150 NE 501, 43 ALR 1320 (1926); *Stein v. Simpson,* 37 Cal 2d 79, 230 P2d 816 (1951); *In re Farmers' & Merchants' State Bank of Nooksack,* 175 Wash 78, 26 P2d 631 (1933); *Hathaway v. Ford Motor Co.,* 264 F 952, cert den 254 US 644, 41 S Ct 15, 65 L Ed 454 (CA 9th, Or., 1920). A common illustration is the right of a junior lienor to be subrogated when he pays indebtedness secured by senior liens. *Brown v. Crawford,* 252 F 248 (DC Or., 1918).

■ Again, when one has a moral duty or at least a moral privilege to pay the debt of another he will be granted the right of subrogation. Thus, one who furnishes necessities for another is not a "volunteer" and is entitled to be subrogated to that other's right to recover against any property charged with his support. Application of Mach, 71 SD 460, 25 NW2d 881 (1947); *Vance v. Atherton,* 252 Ky 591, 67 SW2d 968 (1934); Annotation, 31 ALR 658. The rule is not limited to the furnishing of necessities. For instance, it has been held that a bank superintendent who paid the claims of depositors was entitled to be subrogated to their rights against stockholders of the bank, his managerial responsibility being a sufficient interest to entitle him to pay the debt and demand subrogation. *Love v. Robinson,* 161 Miss 585, 137 So 499 (1931).

■ Applying these equitable principles, we think it is clear that the plaintiff should not be deemed a "vol-

unteer" by joining as co-maker on the $5,300 note given partly as payment of the Ward note. Evidence indicates that her individual property was attached by the Bank of America to secure payment by her husband of the Ward note, on which he was charged as a surety. If this attachment was in effect when plaintiff executed the $5,300 note, she had a property interest to protect by payment of the debt. This is so even though the attachment may have been subject to legal challenge. Cf *Fresno Inv. Co. v. Brandon,* 79 Cal App 387, 249 P 548 (1926); *Avey v. American Surety Co.,* 146 Misc 224, 260 NYS 828 (1930).

■■ Evidence of the attachment is not very satisfactory. However, apart from this, we think the volunteer rule is inapplicable for the reason that the plaintiff's economic interest as a wife in her husband's financial well-being justified her payment of the debt. Such an interest is no more tenuous than others which have been held sufficient to support claims for subrogation against the "volunteer" rule challenge. In any case where the wife is not independently wealthy she will suffer hardship through foreclosure of her husband's individual indebtedness. If by binding herself for satisfaction of the debt she is able to obtain terms of payment less onerous for the family than would otherwise be the case, she does not act as a mere interloper. Although no authority exactly in point has come to our attention, it is worth noting that a wife's right of dower has been held a sufficient interest to entitle her to subrogation upon payment of her husband's debt, *Broyles v. Edmonson,* 193 Ark 1125, 104 SW2d 813 (1937); *Elmora & West End Building & Loan Ass'n v. Dancy,* 108 NJ Eq 542, 155 A 796 (1931). And it has been held that a daughter's mere expectancy of a share in her mother's estate was an interest

which entitled the daughter to subrogation for payments made against mortgaged indebtedness of the estate. *Jones v. Remley,* 74 NE2d 109, mod. 75 NE2d 179 (Ohio App, 1947). Aside from any measure of economic interest, we could justify our decision upon the ground of moral interest. Equity will consider that a wife has a moral privilege to pay her husband's debt and claim subrogation.

There is a further reason why the "volunteer" rule is inapplicable to this case. Plaintiff signed the $5,300 note as co-maker with her husband, Vitale, and must have acted with his knowledge and consent. The plaintiff was thus invited by a debtor upon the original instrument to satisfy the debt. Had plaintiff been requested by Ward, the maker of the $2,600 note on which Vitale as surety was charged, to satisfy the instrument, she would not have been a "volunteer" by doing so, and would clearly have become entitled to be subrogated to the Bank's claim against Ward. *Emmert v. Thompson,* 49 Minn 386, 52 NW 31 (1892); *Gans v. Thieme,* 93 NY 225 (1883); *Warford v. Hankins,* 150 Ind 489, 50 NE 468 (1898); *Kent v. Bailey,* 181 Iowa 489, 164 NW 852 (1917); *Smith v. Sprague,* 244 Mich 577, 222 NW 207 (1928); *Russell v. Grisham,* 177 Miss 435, 170 So 900 (1936); *Bourquin v. Feland,* 189 Okla 498, 117 P2d 789 (1941); *Teal v. Thompson,* 180 Ark 63, 20 SW2d 307 (1929); *Baker v. Farmers' Bank of Conway,* 220 Mo App 85, 279 SW 428 (1926); *Banks v. Cartwright,* 26 SW2d 708 (Tex Civ App 1930). Similarly, we think that one who at the request of the surety pays the debt of the surety incurred by his principal's default, is not a mere "volunteer" and has an equity strong enough to entitle him to claim the surety's right of subrogation. This is certainly true where the parties

are husband and wife. Although the defaulting principal is not bound by estoppel, as would be the case had he himself requested that another make payment, he has no countervailing equity and will not be heard to complain that the result is an unjust one.

Accordingly, we conclude that the plaintiff succeeded by the process of subrogation to the rights of the bank.

The defendant's brief evinces a fear that the bank may yet assert a claim against him upon the note which we have been considering. No one testified to that effect and not a single word was uttered by any witness which could prompt such a misgiving. If the defendant really entertained such a fear he could have dissipated it easily by paying the money into the registry of the court or by interpleading the bank. He did neither. Obviously, the money which the defendant possesses and which should be employed in the discharge of the unpaid balance of the note is not beneficially his money. He holds it in trust for the discharge of the note. The defendant assumed the payment of all approved claims by a writing which he signed February 20, 1951. The period of limitations upon an action based upon the defendant's assumption of liability is six years. ORS 12.080. Accordingly, it would be impossible for the bank now to institute an action against the defendant.

The judgment of the circuit court is reversed. The cause is remanded with instructions to enter judgment in favor of the plaintiff.