DAMPSKIBSAKTIESELSKABET, etc., et al., Appellees,

v.

BELLINGHAM STEVEDORING COMPANY, Appellant,
and
Intalco Aluminum Corporation, et al., Appellees.

AMERICAN METAL CLIMAX, INC., Appellees,

v.

BELLINGHAM STEVEDORING COMPANY, Appellant,
and
Intalco Aluminum Corporation, et al., Appellees.

Nos. 25551, 25552.

United States Court of Appeals, Ninth Circuit.

March 24, 1972.

Rehearing Denied June 12, 1972.

Jacob A. Mikkelborg (argued), of Long, Mikkelborg, Wells & Fryer, Earle W. Zinn, of Lycette, Diamond & Sylvester, Seattle, Wash., for appellant.

Thomas J. McKey, Jr. (argued), of Bogel, Gates, Dobrin, Wakefield & Long, Martin P. Detels, Jr. (argued), of Detels, Draper & Marinkovich, John G. Bergmann (argued), of Elvidge, Veblen, Tewell, Bergmann & Taylor, Seattle, Wash., for appellees.

Before DUNIWAY, HUFSTEDLER and CHOY, Circuit Judges.

CHOY, Circuit Judge:

Bellingham Stevedoring Company appeals from a judgment of the district court, 306 F.Supp. 170, holding the appellant liable for damage caused by the negligence of an employee who was the operator of a crane unloading cargo off a ship. We affirm.

The ship, Troja, is owned by the partnership Wilh. Wilhelmsen which is composed of Dampskibsaktieselskabet Den Norske Afrika Og Australieline and other interests (Wilhelmsen). The Troja was chartered to both a time-charterer and a voyage-charterer. At the time of this accident, the time-charterer was A/S Kristian Jebsens Rederi (Jebsens). The voyage-charterer was Aluminum Metal Climax, Inc. (A.M.C.) whose plant was the destination of the bulk alumina cargo being unloaded at the time of the accident.

The crane involved in the accident was being leased, along with other dock facilities, by the Intalco Aluminum Corporation (Intalco). The machine had been manufactured and installed by McDowell-Wellman & Co. (McDowell). Pursuant to a stevedoring contract with Intalco, Bellingham Stevedoring Company (Bellingham) provided longshoremen crews, including a crane operator, to unload the Troja.

On December 1, 1966, crane operator Guy Williams was working the Troja on a shift which was scheduled to end at 6:00 p. m. High winds had been blowing all day causing the men to stop operations on at least one occasion in mid-afternoon.

Due to the high winds, Williams decided to shut down the crane before the end of the shift. His decision was also based on the fact that a repair crew was fixing the bucket lift, used to unload the bulk alumina. The longshoremen could not resume work until the bucket was ready.

At approximately 4:50 p. m., Williams brought the crane to a vertical position and set it into its cradle alongside the king-post. Normally, the boom would have been left in a horizontal position so that the next shift crew could begin work right away. This usual procedure was dangerous, however, because the winds would be likely to swing the boom uncontrollably. Soon after Williams left the winch control tower, the boom fell on the Troja, damaging both the ship and the boom.

Wilhelmsen and Jebsens sued Bellingham and Intalco; Intalco impleaded McDowell as a third party defendant. A.M.C. brought a separate suit against Bellingham and the latter impleaded Intalco. Each defendant claimed indemnity from the other defendants for whatever damages might be imposed.

After a consolidated trial (jury-waived), the district judge found that the sole cause of the accident was the negligence of Bellingham's crane operator, Guy Williams. On appeal, Bellingham challenges this factual finding. Bellingham also contends that the district judge erred in awarding damages to Jebsens and A.M.C. in subrogation for payments made to Wilhelmsen to cover the costs of delay.

The finding that Williams' negligence was the sole cause of the accident is a factual determination presumed by this court to be correct, unless "clearly erroneous." Rule 52(a), Federal Rules of

Civil Procedure. "We cannot overturn a finding unless, after considering the entire evidence, we are left with the definite and firm conviction that a mistake has been committed." Soderhamn Machine Mfg. Co. v. Martin Bros. Container & Timber Products Corp., 415 F.2d 1058, 1060 (9th Cir. 1969).

Bellingham's challenge to the findings consists of two main pillars. First, Williams testified that he distinctly remembered pushing the "Stop" button and engaging the manual brake. Bellingham contends that the judge erred in disregarding this direct evidence and favoring instead the "speculation" of expert witnesses.

■ The record indicates ample evidence to support the district judge's determination that Williams failed to do these two things. All parties agreed that the accident resulted from the winch drum moving in a "down" direction, unwinding and rewinding the cable until it snapped. Had the "Stop" button been pushed, there would have been certain physical consequences when the boom fell. For example, the drum would have been scarred and the brake would have been burned by the friction of the two pieces. Neither piece was so damaged. Also, the electrical circuits would probably have shorted. They did not. The hand brake is a ratchet type, the teeth of which would have been broken by the drum rubbing against the brake arm. After the accident, the ratchet teeth were in good condition and the brake lever was locked in a rest or unengaged position. Had the hand brake been in stop position, the drum would have been scarred and the brake would have been burned. As mentioned above, these indicia were conspicuously absent.

The second factual argument of Bellingham is that the accident could not have been caused by Williams' negligence because of a time problem. The argument runs thus: witnesses testified that it was approximately fifteen minutes from the time Williams left the winch control room until the boom was down; experts agreed that the winch drum would take 7.43 minutes to unwind and rewind; therefore, a different cause, probably the high winds, must have re-activated the motor and caused the winch to begin turning again.

■ A review of the record convinces us that this argument must also fail. The fifteen minute figure was approximate only. Williams himself stated soon after the accident that he left the winch control room at 4:55 instead of 4:50, as shown in the log book. The 5:05 time entry in the log book was an observation that the boom was down, not that the boom actually fell at 5:05.

True, the experts agreed that the *normal* period for unwinding and rewinding the cable on the winch drum was 7.43 minutes. However, after the accident, much of the cable was discovered wrapped around the shaft which drives the winch drum. This shaft is much smaller in diameter than the drum itself. The drive mechanism would have had to make many more revolutions to rewind the cable, after it snagged on the shaft. It would have taken longer than 7.43 minutes for this to happen.

Based on the physical facts, the district judge found that, although Williams "may very well honestly believe that he pushed the stop button and set the hand brake, I am persuaded that he did not." Bellingham has failed to establish that the judge was clearly erroneous in his findings.

We now turn to Bellingham's argument that the district judge misapplied the law by holding that Jebsens and A. M.C. were entitled to subrogation. Jebsens paid Wilhelmsen for "demurrage," i. e., costs of delay, during the time that the Troja was still tied up at Intalco's dock. During this time, the boom was lying across one of the ship's holds. The damage which the hold sustained was not so bad that the cargo could not be unloaded. However, the Intalco dock was not set up with another crane.

A.M.C. paid for "demurrage" while the ship was being moved to and unloaded at another dock on the Columbia River.

Bellingham stipulated that the costs of delay were the direct and proximate result of the accident. It is clear that Wilhelmsen could have recovered demurrage from Bellingham, if the costs had not already been covered by Jebsens and A.M.C. However, Bellingham contends that Jebsens and A.M.C. were not obligated by the terms of their charter parties to pay Wilhelmsen for the demurrage, and in paying, the charterers acted as volunteers, which disqualifies them from recovery in subrogation.

The district judge applied a different standard from that urged by Bellingham. Based on the terms of the charter parties, Jebsens and A.M.C. believed in good faith that they were obligated to pay demurrage. The district judge found that this belief was a reasonable interpretation of the terms of the charter-parties and that a reasonable good faith belief that one is obligated to pay is sufficient for application of the equitable doctrine of subrogation.

We agree. The good faith standard follows from the liberal policies behind the doctrine of subrogation. *Cf.* Credit Bureau Corp. v. Beckstead, 63 Wash.2d 183, 385 P.2d 864 (1963); In re Farmers' & Merchants State Bank, 175 Wash. 78, 26 P.2d 631 (1933). The parties have cited no Washington case specifically adopting this rule and we have found none, but the standard is not inconsistent with Washington law.

■ Jebsens and A.M.C. were confronted with probable or possible liability. To protect their interests and to avoid the costs of defending a suit by Wilhelmsen, the charterers paid the shipowner. We hold that this good faith belief was sufficient to entitle them to subrogation rights against Bellingham for demurrage for which the latter was responsible. See Mosher v. Conway, 45 Ariz. 463, 46 P.2d 110 (1935).

Affirmed.