(No. 44054.▮

HERBERT SHER, Appellee, v. STEPHEN H. ROBIN *et al.*
—(Stephen H. Robin, Appellant.)

*Opinion filed Nov. 30, 1972.—Rehearing denied Jan. 26, 1973.*

KLUCZYNSKI, J., took no part.

GOLDENHERSH, J., dissenting.

CONCANNON, DILLON, SNOOK & MORTON, of Chicago (HERBERT MORTON and JOHN J. O'TOOLE, of counsel), for appellant.

MORTIMER & HOFFMAN, of Chicago (J. STIRLING MORTIMER and PAUL R. HOFFMAN, of counsel), for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

Herbert Sher brought an action in the circuit court of Cook County to rescind a contract executed in June 1966, under which he had purchased North Shore Speed and

Auto, Inc. (hereafter, North Shore), a solely-owned corporation engaged in the business of selling automotive speed equipment. The contract price was $47,000 plus approximately $9,000 to cover prepaid advertising and inventory. The plaintiff, who had conducted the business for several months after the sale, also sought actual and punitive damages, alleging that he had been induced to enter into the contract by fraudulent misrepresentations of the defendant Stephen H. Robin.

The defendant, the former sole owner and president of North Shore, counterclaimed for moneys he had paid for advertising contracted for by North Shore after the plaintiff had become its sole owner and officer.

Following a bench trial, the court entered judgment for the defendant on the plaintiff's action for rescission and damages, and also entered a judgment for $6,555.13 for the defendant on his counterclaim.

The appellate court reversed both judgments. (*Sher v. Robin, 131 Ill.App.2d 404.*) It reversed the judgment for the defendant on the plaintiff's fraud action on the ground that it was against the manifest weight of the evidence. The court considered that the evidence established that the defendant had misrepresented the gross margin of profit of the business in a financial statement furnished the plaintiff during the sale negotiations. The court reversed the defendant's judgment on his counterclaim, judging, it would appear, that he had been a volunteer in paying the claims against North Shore.

We granted leave to appeal.

The financial statement given to the plaintiff, which purported to reflect the operations of the business from April 1, 1965, to March 31, 1966, indicated a gross margin of profit of approximately 40%. Gross margin of profit is the ratio between gross profit and gross sales, gross profit being defined as gross sales less the gross cost of goods sold. The "cost of goods sold," according to the statement, was $110,211.24, gross sales were indicated to be

$186,125.26, and the gross profit was $75,914.02. At trial and thereafter the defendant has maintained that these figures were accurate and that North Shore's gross margin or profit was in fact around 40%.

The appellate court held that the evidence established that the cost of goods sold was higher than had been represented and that therefore the gross margin of profit was lower than had been indicated. The court grounded its reversal of the trial court on several factors. It found that the testimony of the defendant that the gross margin of profit was in fact 40% was unsatisfactory and that his testimony had been impeached by an earlier inconsistent statement. It noted the opinion of an accountant appointed by the trial court that the gross margin of profit was lower than 40%; and it observed that the Federal corporate income tax return which had been signed by the defendant, and which reflected the same period as the financial statement, indicated a substantially lower gross margin of profit. The corporate return had been filed in September, 1966, approximately three months after the sale of the business.

The tax return indicated the same figure as the financial statement for gross sales ($186,125.26) but the cost of goods was stated to be $134,820.89, approximately $24,000 greater than the $110,211.74 shown on the financial statement. The resulting gross margin of profit was, according to the return, 27.56%, or approximately 12.5% less than the 40% represented by the defendant as the true gross margin. The net income of the corporation before taxes according to the corporate return was $286.15, or 15/100 of 1% of sales, while the net income of the corporation before taxes according to the financial statement was $24,895, or 13% of sales.

The defendant argues that the higher cost of goods sold reflected on the corporate return should not of itself be viewed as showing that the gross margin of profit and net income were lower than represented on the financial

statement, since the record contains evidence which would contradict this conclusion. The additional $24,000 shown for cost of goods sold on the corporate return, the defendant says, actually reflected money paid as an officer's (the defendant's) salary and an extraordinary burglary loss.

The defendant acknowledged in oral argument that classification of this additional $24,000 under "cost of goods sold" on the return was not accurate, but he denies that this inaccurate classifying establishes that the "cost of goods sold" item appearing in the financial statement was false. If the additional $24,000 reported under "cost of goods sold" on the return are moneys attributable to an extraordinary burglary loss and additional officer's salary, then, the defendant says, there was no misrepresentation of either the cost of goods sold or the income from the business available to the owner. He points out that North Shore was a small corporation with a single owner and officer. The income available to the sole owner and officer of a small corporation is from the salary he pays himself and from the earnings of the business after other expenses. Money taken as a salary is a deductible corporate expense, so that an election to take out all business earnings as salary reduces the income of the corporation but has no substantial effect, apart from Federal tax factors not relevant here, on the actual income from the business available to the sole owner and officer.

On the financial statement, officer's salary was listed as approximately $13,000, the net income of the corporation before taxes as approximately $24,000, and the net income of the corporation after taxes as about $19,000. Thus, the moneys available to the sole owner and officer were represented to be about $32,000 after Federal taxes and $37,000 before Federal taxes. There was no indication on the financial statement that the defendant had withdrawn additional amounts as salary. But the defendant argues that the question is whether the financial statement

accurately represented that there were $32,000 to $37,000 in earnings available to the owner, not whether amounts listed as net corporate profit had been in fact withdrawn as salary. This is so, he says, because under the sales agreement, the plaintiff was to acquire only the corporate shell, so to speak, and the defendant would retain all corporate earnings to the date of sale, whether in the form of corporate income or officer's salary.

We need not address ourselves to this argument, for we judge that on another basis the appellate court correctly held that the trial court's ruling was contrary to the manifest weight of the evidence.

North Shore's margin of profit was obviously a factor of great importance to a would-be purchaser of the business. The financial statement reflected a gross margin of profit of 40%. The statement had been prepared by the defendant's accountant, who noted on the statement that it had been prepared from books and records without audit or verification and that it was presented without opinion. The accountant appointed by the court to examine North Shore's books and records described them as incomplete.

In a pretrial deposition, the defendant acknowledged that the average mark-up on sales of equipment listed in the business catalog of North Shore was 30%. At trial, after the defendant had testified that the gross margin of profit of North Shore from April 1, 1965, to March 31, 1966, was 40%, as the financial statement represented, the plaintiff's attorney attempted to impeach the testimony by the defendant's prior testimony on deposition, which was that an average mark-up was 30%. The trial judge noted that the defendant's statement in his deposition related to the average mark-up, and was not necessarily inconsistent with the defendant's 40% representation in the financial statement and with his testimony at trial.

However, when questioned by his attorney on direct examination as to North Shore's having a margin of 40%

the defendant attributed the 40% margin to volume purchases at discount and at substantial savings of close-outs of speed equipment from manufacturers wishing to dispose of large quantities of such merchandise. When asked on cross-examination to show these special purchases in his or North Shore's books and records he was unable to do so, and he did not otherwise establish the purchases. Considering the entire record, the appellate court did not err in reversing the judgment in favor of the defendant on the suit for rescission.

The appellate court also acted properly in reversing the judgment for the defendant for $6,555.13 on his counterclaim. The record shows the defendant's testimony that when he owned North Shore he advertised in various automotive magazines through an advertising agency. Robert Schoenbrod, a member of the agency, because of friendship with the defendant and the defendant's father, the defendant said, waived the agency's 15% commission for advertising placed for North Shore. The defendant in return assumed personal responsibility for the liability for advertising to be incurred by North Shore, and promised to notify Schoenbrod if he ever sold the business. The defendant testified that he neglected to notify Schoenbrod of the change of ownership, apparently because of his impression that the plaintiff would place advertising through another agency.

About a month after the sale, the defendant said, he was notified by Schoenbrod that the plaintiff had continued to place North Shore advertising through the agency, and that the plaintiff refused to pay for it. The defendant then undertook to have payment made to the agency, but he did not first request the plaintiff to make payment nor did he communicate with him regarding his reason for refusing to pay the bills. The defendant was short of funds, and he arranged to have the Harbor Management Co., which was owned by his father, make the payment in his behalf, and he later reimbursed Harbor

Management. The plaintiff admitted having placed advertising and having refused to pay for it.

The trial court held that the evidence established the payment by the defendant of $6,555.13 to cover the advertising expenses incurred by North Shore and rejected the plaintiff's argument that the defendant had acted as a volunteer and was therefore barred from recovering.

We consider that under the circumstances the defendant was a volunteer in paying the agency for North Shore's advertising. This court has said: "It is well settled that a mere stranger or volunteer cannot, by paying a debt for which another is bound, be subrogated to the creditor's rights in respect to the security given by the real debtor. But if the person who pays the debt is compelled to pay for the protection of his own interest and rights, then the substitution should be made. (*Bennet v. Chandler, 199 Ill. 97; Hough v. Aetna Life Ins. Co., 57 Ill. 318.*) In the *Chandler case* it was said that 'a stranger within the meaning of this rule is not necessarily one who has had nothing to do with the transaction out of which the debt grew. Any one, who is under no legal obligation or liability to pay the debt, is a stranger, and, if he pays the debt, a mere volunteer'." *Ohio National Life Ins. Co. v. Board of Education, 387 Ill. 159, 178.*

The defendant had no legal obligation to pay the liabilities incurred by North Shore after the plaintiff became its owner. He had no interest in the corporation. Before making payment, he did not discuss the question with the plaintiff; no question of the defendant's having been authorized to pay was involved.

For the reasons given, the judgment of the appellate court is affirmed.

*Judgment affirmed.*

MR. JUSTICE KLUCZYNSKI took no part in the consideration or decision of this case.

MR JUSTICE GOLDENHERSH, dissenting:

I respectfully dissent from the majority opinion. I would reverse the judgment of the appellate court and affirm the circuit court. Neither the appellate court nor the majority cite any authority in support of their holding that defendant's alleged fraud entitled plaintiff to rescind the contract and for the very good reason that none exists. In reversing the judgment of the trial court both the appellate court and the majority have failed to observe the long-established rule that findings of fact by the trial court sitting without a jury will not be disturbed unless they are against the manifest weight of the evidence. The trial court found, and in my opinion the record supports the finding, "That there was no misrepresentation by the defendant, STEPHEN H. ROBIN, to the plaintiff, HERBERT SHER, or to anyone else, concerning the gross margin of profit of NORTH SHORE SPEED AND AUTO, INC., for the fiscal period ended March 31, 1966, or for any other period; that the gross margin of profit of said business, as disclosed by the financial statements admitted in evidence as plaintiff's Exhibit 7, was substantially correct and was not contravened by any other credible evidence, but was supported by other credible evidence."

Further, the record fails to support the appellate court's finding that the plaintiff in any way relied on the so-called misrepresentation and demonstrates clearly that, assuming *arguendo* such reliance, plaintiff had no right to rely thereon.

The rule applicable to the facts in this case is stated in *Schmidt v. Landfield, 20 Ill.2d 89,* wherein at page 93 the court said: "Even if it is assumed that the plaintiffs in fact relied upon the misinformation which had been previously given them by defendant, it cannot be said that such reliance was justified so as to sustain the cause of action sought to be alleged here. As a general rule one who is guilty of fraudulent misrepresentation cannot interpose a

defense that the person defrauded was negligent in failing to discover the truth. (*Roda v. Berko, 401 Ill. 335.*) The general rule is subject to the qualification, however, that the party seeking relief had a right to rely upon the representation made. (*Morel v. Masalski, 333 Ill. 41.*) This court has pointed out accordingly that 'In all cases where it is sought to hold one liable for false representations, the question necessarily arises, whether, under all circumstances, the plaintiff had a right to rely upon them. In determining this question, the representations must be viewed in the light of all the facts of which the plaintiff had actual notice, and also of such as he might have availed himself by the exercise of ordinary prudence.' (*Dillman v. Nadlehoffer, 119 Ill. 567, 577.*) The rule is well established that a party is not justified in relying on representations made when he has ample opportunity to ascertain the truth of the representations before he acts. When he is afforded the opportunity of knowing the truth of the representations he is chargeable with knowledge; and if he does not avail himself of the means of knowledge open to him he cannot be heard to say he was deceived by misrepresentations."

The record shows that in at least one discussion with the defendant, plaintiff was accompanied by a friend who was a licensed attorney (not practicing) with "an accounting background," and who discussed with defendant the markup on various types of merchandise. At that time both plaintiff and his friend had examined a financial statement prepared by defendant's accountant which contained a balance sheet as of March 31, 1966, a statement of income and retained eaenings for the year, and a statement of earnings for the quarter ending on the same date. The statement bore the following comment: "The following statements were prepared from the books and records without audit or verification and therefore are presented without opinion."

The record reflects that plaintiff had a degree in

chemical engineering and a master's degree in business administration and management. Prior to entering into this transaction he had owned and operated an office service business and a mail order business which sold household goods. In the transaction involved in this case he purchased all of the outstanding capital stock of the corporation. The contract between plaintiff and defendant contained a number of provisions which could affect the final purchase price, such as the amount of prepaid advertising and the value of the current inventory. It also contained warranties concerning outstanding capital stock and liabilities and provided for the escrow of $14,700 to pay any liabilities covered by defendant's warranty. It contained no language in any manner relevant to the markup on merchandise sold.

The contract provided for delivery to the plaintiff of all of the outstanding shares of the capital stock of the corporation, and the record contains nothing which indicates that plaintiff did not, as is customary in this type of transaction, come into possession of the corporate books and records. There is nothing in the record to indicate why he and his adviser did not examine the corporate books and records to ascertain whether the statement upon which he claims to have relied truly reflected the sales and markup. Obviously he had the opportunity to do so and the *caveat* in the financial statement would certainly suggest the advisability of that precaution.

In concluding that there was misrepresentation on the part of the defendant the appellate court appears to have relied upon the testimony of Theodore Perry. A fair reading of his testimony does not support the finding that defendant misrepresented the markup on sales, and to the extent that it is based upon anything but Perry's conclusions, is corroborative of defendant's position. Nothing in the record supports the statement in the appellate court's opinion that "it appears indisputable that defendant

sought to defraud either defendant or the federal government, and understandably, it has not been argued in this court that the income tax return was false."

The majority apparently relies on so-called impeachment of the defendant by means of a pretrial deposition and his inability to point out in the corporate books and records any instances of purchases of "close-out" merchandise. These matters relate to the defendant's credibility, which was for the trial court to determine, and do not support the majority's conclusion that "considering the entire record, the appellate court did not err in reversing the judgment ***." In my opinion, the plaintiff failed to prove a fradulent misrepresentation and assuming, *arguendo,* that he did, he failed to prove a legal basis for reliance thereon, and the record proves beyond question the availability of the opportunity and means to ascertain the truth, and plaintiff's unexplained failure to do so.