MEDIGROUP, INC., Plaintiff-Appellant,

v.

Phillip SCHILDKNECHT and Neil P. Gavin, Defendants-Appellees.

No. 71-1576.

United States Court of Appeals, Seventh Circuit.

Argued April 26, 1972.

Decided June 29, 1972.

Joseph B. McDonnell, Dixon & Mc-Donnell, Belleville, Ill., for Medigroup, Inc., a Corporation, plaintiff-appellant.

Charles R. Brady, Belleville, Ill., for defendants-appellees.

Before CUMMINGS and SPRECHER, Circuit Judges, and LARAMORE, Senior Judge.*

SPRECHER, Circuit Judge.

This diversity action [1] is for damages for breach of warranty in connection with the sale of the stock of two corporations which owned and operated Parkview Manor, a nursing home in O'Fallon, Illinois.

During January, 1969, plaintiff's president negotiated with defendants for sale of the stock. Defendants furnished him the most recent balance sheets available, which listed each corporation's

---

* Senior Judge Don N. Laramore of the Court of Claims is sitting by designation.

1. Plaintiff Medigroup, a Delaware corporation, is successor by merger to Bernard Nursing Home, Inc., a Missouri corporation. Defendants are residents of Illinois.

assets and liabilities as of November 30, 1968.

Plaintiff's offer of purchase contained the following language:

It is understood that in accepting this offer you make the following warranties:

\* \* \* \* \* \*

That balance sheets for both corporations as of November 30, 1968 being given the undersigned are true and correct, and that as of the time of closing there will have been no changes except in the ordinary course of business.

Defendants accepted the offer in writing on February 15, 1969. The closing took place on April 30, 1969.

Plaintiff's claim is based on the alleged omission or understatement of five debts of the Parkview Manor corporations on the November 30, 1968, balance sheets. Four of the obligations remain unpaid; the allegations of the complaint relating to them were dismissed without prejudice by the district court at the close of plaintiff's case. The fifth obligation, described in part II of this opinion, was paid with three checks by Parkview Manor in December, 1968, and January, 1969. The allegation relating to the fifth debt was submitted to the jury, which returned a verdict in favor of defendants. Plaintiff appeals as to all debts.

I

The following are the four unpaid liabilities of Parkview Manor:

(1) $6,892.33 to Budina Const. Co. This amount is based on a retention owed to the contractor for construction of the nursing home. Budina's only documentation of the debt is an undated, handwritten notation by one of the defendants that he is having a note prepared. There is a reference to this obligation in the minutes of Parkview Manor's board of directors of April 29, 1969, which indicates the claim had not been paid because Budina had not repaired the roof satisfactorily. The only liability to

Budina listed in the November 30, 1968, balance sheets is $1,000.

(2) $10,792.43 to A. A. Ohlendorf and Son. Ohlendorf holds a note from one of the Parkview Manor corporations, dated January 1, 1967, which promises payment of principal and 5 percent interest two years after demand. Ohlendorf believed payment was due on January 1, 1969, although it is not clear from the record when or if demand was made. The note was listed on the November 30, 1968, balance sheets at $5,000.

(3) $25,000 to Glenn Frazier. Frazier agreed with defendants in August, 1967, to design an addition to the nursing home. The $25,000 fee was to be paid on the day of the bid opening, which was April 29, 1969. There was testimony that Frazier did not start work on the project until January or February, 1969, and that the fee was to be paid only after state approval of the plans, which was obtained in March or April, 1969. The $25,000 does not appear on the balance sheets.

(4) $14,500 to Patrick Fleming. Counsel for Parkview Manor, Fleming had a verbal agreement with defendants that he would receive a $14,500 fee upon the funding of a commitment for a construction loan. Fleming admitted in his testimony that the contingency on which his fee depended never occurred. The balance sheets do not include the $14,500.

It is plaintiff's theory that the stock it purchased was worth the amount represented on the balance sheets less the portion of these liabilities and the fifth claim omitted from the balance sheets. Plaintiff says defendants owe it the difference between the purported value and the "actual" worth of the stock.

The district judge dismissed the claims on the four unpaid items because plaintiff had not proved that it had been damaged by their omission from the balance sheets.

In the usual breach-of-warranty case, the validity of the "undisclosed" liability is not questioned by either party. In

528

fact, plaintiffs ordinarily pay the liabilities before suing the sellers of the stock. Plaintiff relies on Burroughs Int'l Co. v. Datronics Engineers, Inc., 254 Md. 327, 255 A.2d 341 (1969). That case does not discuss whether payment is required and in fact at least some of the liabilities had been paid. *Burroughs* differs substantially from this case because it concerned the application of an escrow fund established to cover whatever amount liabilities exceeded assets by more than $220,000.

■ We believe the district judge was correct in applying the general rule that a plaintiff must show he has actually sustained a loss before he can recover damages. Marks v. Loomer, 4 Ill.App. 198 (1879). Damages must be ascertainable to a reasonable degree of certainty; they cannot be purely speculative. Chicago Coliseum Club v. Dempsey, 265 Ill.App. 542 (1932).

Here plaintiff has stated that it considers the four unpaid debts to be valid liabilities of Medigroup. But it has not declared its intention to pay any of them. It has obvious defenses to at least three of them: Budina (lack of documentation and failure to repair); Ohlendorf (lack of demand); and Fleming (failure of condition). Plaintiff may decide to contest any of them on a theory that it is not responsible for undisclosed obligations of Parkview. Counsel for plaintiff mentioned at the hearing on the motion for a directed verdict that it would not pay any of the creditors if it had a valid defense to the suit, such as running of the statute of limitations. If plaintiff recovered for such a dubious claim as Fleming's, for example, and Fleming were unsuccessful in his pending suit against plaintiff for the fee, plaintiff would be unjustly enriched by $14,500.

■ This situation is closely analogous to subrogation, which "is broad enough to include every instance in which one person, not acting voluntarily, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter. . . ." Geneva Const. Co. v. Martin Transfer & Storage Co., 351 Ill.App. 289, 114 N.E.2d 906, 910 (1953), aff'd, 4 Ill.2d 273, 122 N.E.2d 540 (1954). There is no right to subrogation until the original creditor has been paid in full. Andrews v. St. Louis Joint Stock Land Bank, 127 F.2d 799 (8th Cir.1942); Conwell v. McCowan, 53 Ill. 363 (1870).

■ Since these four claims were dismissed without prejudice, plaintiff is free to contest or to pay them and, if it is thereby damaged, to sue defendants again. This result is proper and fair to all parties.

II

The fifth claim was for $40,000 paid to James Schmitt of the Mississippi Mortgage Co. as a fee for obtaining a commitment for a construction loan of $1,450,000. Schmitt began looking for a lender in March, 1968, but the letter of commitment was not written until December 20, 1968. By Schmitt's agreement with Parkview, he was not entitled to his fee until Parkview had received a letter of commitment. The $40,000 does not appear on the November 30, 1968, balance sheets, perhaps because the liability did not become definite until receipt of the letter of commitment the following month.

The jury found defendants not liable for this claim. Plaintiff raises two issues on appeal, both centering on defendants' warranty that the balance sheets were accurate and that there would be no changes before the closing "except in the ordinary course of business."

Since it is clear from the offer of purchase that plaintiff was aware of the loan commitment at the end of negotiations, the question arises whether the parties intended that transactions incidental to the loan be considered "in the ordinary course of business." Defendants introduced substantial testimony that plaintiff's officers were told about the finder's fee during the initial nego-

tiations. They did not object to its payment nor to its omission from the balance sheets. Plaintiff objected to the admission of this testimony as parol evidence which varied the terms of the written contract.

■ The validity of plaintiff's objection depends on whether the phrase, "in the ordinary course of business," is ambiguous. If it is, parol evidence is admissible to establish the practical interpretation of the parties. Schneider v. Neubert, 308 Ill. 40, 139 N.E. 84 (1923). Parol evidence has been admitted to interpret such phrases as "[changes] resulting from normal station operations" and "good will." Adzigian v. WORL Broadcasting Corp., 348 Mass. 777, 202 N.E.2d 915 (1964); Unique Watch Crystal Co., Inc. v. Kotler, 344 Ill.App. 54, 99 N.E.2d 728 (1951).

■■ If a buyer did not know the selling corporation had made arrangements to construct a large addition to its plant, "the ordinary course of business" might refer to such transactions as billing customers and purchasing supplies. But a buyer aware of expansion plans would intend "the ordinary course of business" to include whatever transactions are normally incurred in effectuating such plans. Therefore it was proper for the district judge to admit testimony about the parties' discussions of the construction loan and the finder's fee.

The cases plaintiff relies on are instances of the exclusion of parol evidence which would change or contradict the terms of the written contract. They do not govern here, because admission of the negotiation discussions merely gives definition and context to the ambiguous phrase, "in the ordinary course of business."

■ Plaintiff's second allegation of error is an attack on two instructions given to the jury. The first was a definition of "ordinary course of business" as "that course of conduct that reasonable prudent men would use in conducting business affairs as they may occur from day to day." Plaintiff also claims the following instruction was incorrect:

In determining whether a given transaction is made in the ordinary and usual course of business of a party, the question is not whether such transactions are usual in the general conduct of business throughout the community, but whether they are according to the usual course of business of the particular person whose transaction is subject to investigation.

Plaintiff's objection to the first instruction is that the district judge either should have refused to define "ordinary course of business" or should have instructed the jury that the payment of a finder's fee for a large loan commitment was such an unusual transaction that it could not have occurred "in the ordinary course of business." Plaintiff has not shown that the definition given varies in any important element from the definitions it cites. Its real complaint seems to be that the district judge did not direct a verdict against defendants on this aspect of the case. Under the unusual circumstances, however, it was proper to let the jury decide, whether the parties intended that defendants should continue to take whatever steps were proper and necessary to further the construction project. See Schneider v. Neubert, 308 Ill. 40, 139 N.E. 84, 85 (1923).

There is nothing in the record to indicate that plaintiff objected to the giving of the second instruction. Under Fed. R.Civ.P. 51, plaintiff may not assign as error the giving of an instruction to which it did not object. Furthermore, the instruction is consistent with our analysis of "ordinary course of business" above; defendants cite authority for it[2]; and it is difficult to see how the jury's conclusion would have been altered by focusing on the general business community rather than on the particular business.

2. Rison v. Knapp, 20 Fed.Cas. No. 11,861, p. 835 (1868).

We conclude that neither instruction was erroneous.

We have examined plaintiff's argument that certain remarks by the district judge deprived plaintiff of a fair trial. The remarks were neutral and innocuous and would not have prejudiced plaintiff in any way.

The judgment is affirmed.