692 F.2d 455
 34 UCC Rep.Serv. 1335
 AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO,
Plaintiff-Appellant, Cross-Appellee,
v.
WEYERHAEUSER COMPANY, Defendant, Third-Party Plaintiff and
Counter-Defendant- Appellee, Cross-Appellant,
v.
The FIRST JERSEY NATIONAL BANK, Third-Party Defendant and
Counter-Plaintiff- Appellee.
 Nos. 81-2620, 81-2690.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 5, 1982.
Decided Oct. 26, 1982.
 
 Joel S. Siegel, Arvey, Hodes, Costello & Burman, Chicago, Ill., for plaintiff-appellant.
 John W. Rotunno, Bell, Boyd & Lloyd, Chicago, Ill., for defendant-appellee, third party plaintiff.
 Richard W. Burke, Jeffrey D. Waren, Chicago, Ill., for third party defendants.
 Before CUDAHY and ESCHBACH, Circuit Judges, and TEMPLAR,* Senior District Judge.
 CUDAHY, Circuit Judge.
 
 
 1
 In this diversity action, appellant American National Bank and Trust Company ("American") seeks to recover damages for breach of contract arising from an alleged wrongful refusal to accept shares of stock tendered to appellees, Weyerhaeuser Company ("Weyerhaeuser") and its tender offer agent, First Jersey National Bank ("First Jersey"). The district court granted summary judgment in favor of Weyerhaeuser and First Jersey and denied a motion by American for partial summary judgment on damages, concluding that American could not maintain this action under theories of agency, assignment or subrogation. We reverse.
 
 I.
 
 2
 The material facts relevant to the issues on this appeal are largely uncontested.[1] On August 9, 1978, Weyerhaeuser issued a written offer to purchase up to 3,500,000 shares of its common stock at $32.00 per share, provided that the stock was tendered by August 22, 1978. Under the terms of Weyerhaeuser's offer, if more than 3,500,000 shares were tendered, Weyerhaeuser would purchase shares on a pro rata basis from shareholders tendering 100 or more shares each. The offer also allowed shareholders to condition the tender of their shares upon Weyerhaeuser's acceptance of a designated minimum number of shares if the offer was oversubscribed and proration was undertaken. A shareholder could conditionally tender his shares simply by writing the minimum number of shares that Weyerhaeuser must accept in a box captioned "Conditional Tender" appearing on the letter of transmittal which accompanied the tendered share certificates. First Jersey, pursuant to a contract with Weyerhaeuser, was designated as the depositary for the tender offer. Although First Jersey was charged with ascertaining whether all documents required for the tender were properly executed, Weyerhaeuser reserved the right of "[d]etermination of all questions as to validity, form, eligibility, time and acceptance of shares tendered, as well as to the proper completion or execution of Letters of Transmittal and documents ...." Appellee's Supp.App. at 43.
 
 
 3
 On August 18, 1978, American sent a letter to Bivest & Co. ("Bivest") concerning the Weyerhaeuser tender offer.[2] Bivest was the nominee of American to hold title to securities on behalf of the beneficial owners whose trust accounts were managed by American. In this case, Bivest held title to 40,000 shares of Weyerhaeuser common stock beneficially owned by American's customer, the Illinois State Board of Investment (the "Board"). By letter received by American during the afternoon of August 18, the Board authorized American to tender its 40,000 shares of Weyerhaeuser common stock registered in the name of Bivest.
 
 
 4
 Later that afternoon, a teller in American's securities division prepared a letter of transmittal on behalf of Bivest as the registered owner of the Board's 40,000 shares of Weyerhaeuser stock. The teller then sent both the letter and the share certificates to First Jersey, and First Jersey received the letter and certificates before the expiration of Weyerhaeuser's tender offer. Several days after the August 22 expiration date, Weyerhaeuser announced that more than 3,500,000 shares had been tendered. Because the offer was oversubscribed, Weyerhaeuser invoked the proration provisions of the offer to purchase, agreeing to buy 61% of the shares tendered by any tenderor. The offer, however, precluded acceptance of those shares that were defectively tendered and those shares that were conditionally tendered by any tenderor where the minimum number entered in the "Conditional Tender" box exceeded 61% of the total shares tendered by that tenderor.
 
 
 5
 By letter dated September 1, 1978, and received by American no later than September 6, First Jersey returned to American all of the Board's shares of Weyerhaeuser stock, together with a photocopy of the letter of transmittal. First Jersey informed American that the tender was rejected because the letter of transmittal's "Conditional Tender" box was marked "40,000," and this number was in excess of 61% of the total shares tendered.[3] The parties to this appeal dispute as a factual matter who was responsible for entering the number "40,000" in the "Conditional Tender" box. American contends that it desired to tender the 40,000 shares unconditionally (without requiring Weyerhaeuser to accept all 40,000) and, thus, none of its employees wrote that figure in the box. First Jersey, on the other hand, contends that none of its employees entered the "40,000" figure in the box; according to First Jersey, the letter of transmittal it received from American contained the "40,000" figure entered in the "Conditional Tender" box.
 
 
 6
 But as we point out infra, this factual dispute is not directly relevant to the question whether summary judgment was properly granted in favor of the appellees. Rather, the more important fact for our consideration, which is undisputed, is that, if the tender had been accepted, Weyerhaeuser would have purchased 24,400 shares (61% of 40,000) at $32.00 per share for a total price of $780,800.00. On September 7, 1978, one day after receiving the rejection letter from First Jersey, American purchased 24,400 shares of Weyerhaeuser stock at $32.00 per share from the Board for a total price of $780,800.00.[4] Although the market price of Weyerhaeuser stock was actually less than $32.00 at this time of purchase, see infra, note 7, American paid the higher tender offer price in order to make the Board whole for its loss.
 
 
 7
 Soon after receiving the letter from First Jersey,[5] a vice-president of American contacted First Jersey to inquire whether someone at First Jersey inadvertently entered "40,000" in the "Conditional Tender" box. First Jersey denied responsibility for entering the figure in the box and suggested that American contact Mr. Vandevert, corporate secretary of Weyerhaeuser, to determine if Weyerhaeuser would nevertheless accept the tender. In a telephone conversation, American's vice-president informed Vandevert of the tender and rejection of 40,000 Weyerhaeuser shares by First Jersey. Vandevert requested that American set out the pertinent details in a letter, after the writing of which, according to American's witness, Vandevert promised to "look at [the matter] and ... get back to [American]." Dep. of Mr. Hansen at 13. Vandevert received American's letter, which was dated September 8, on September 11.
 
 
 8
 After sending the letter to Vandevert, American closely monitored the price of Weyerhaeuser stock while awaiting a response from Vandevert. During the next several days, the market price of Weyerhaeuser's stock continued to decline slowly. Not hearing from Vandevert for more than a week, American finally called Vandevert by telephone on September 20, 1978, to ascertain his decision regarding the rejected tender.[6] During the telephone conversation of September 20 and as confirmed by letter, Vandevert informed American that Weyerhaeuser stood by First Jersey's initial decision to reject American's tender of 40,000 shares on behalf of the Board. See Appellee's Supp.App. at 64. The next day, September 21, 1978, American sold on the open market the 24,400 shares of Weyerhaeuser stock it had purchased from the Board. Because the market price of Weyerhaeuser stock at this time was more than two dollars per share lower than the tender offer price of $32.00 per share (as well as being about $1.50 below the market price on September 7), American received only $710,887.75 for its shares, compared to the $780,000.00 it paid the Board for these shares.
 
 
 9
 American filed this suit for breach of contract on January 30, 1979, against Weyerhaeuser and First Jersey seeking to recover $69,912.25 (the difference between the price American paid the Board for the Weyerhaeuser stock on September 7, 1978, and the price at which American sold the stock on September 21). Shortly thereafter, Weyerhaeuser filed a third-party complaint against First Jersey, claiming that First Jersey was obligated to indemnify Weyerhaeuser for any liability it might incur. Weyerhaeuser then moved for summary judgment, joined by First Jersey, asserting that under the undisputed facts, American could not state any claim for alleged breach of the offer to purchase the tendered shares since American was not the real party in interest. In the alternative, Weyerhaeuser asked for partial summary judgment on the damage claim, to establish that American's damages (if liability were found) were limited to the difference between the price American paid the Board for the shares on September 7, 1978, and the open market price for the stock on that date.[7] American also moved for partial summary judgment on its damage claim, to establish that the correct measure of damages was instead the difference between the price it paid the Board on September 7 and the price it received when it sold the stock on the open market on September 21.
 
 
 10
 In response to Weyerhaeuser's assertion that it lacked standing as the real party in interest, American argued that it might maintain this action as (1) the assignee of Bivest's claims;[8] (2) as the assignee of the Board's claims;[9] (3) as the principal of its agent, Bivest; (4) as the agent of its undisclosed principal, the Board; and (5) as the subrogee of the Board. The district court, however, rejected all of these theories. The court concluded that since Bivest and the Board assigned their claims after American had made the Board whole for the rejected stock tender, the assignments were, in effect, legal nullities since neither Bivest nor the Board possessed any assignable rights when the purported assignments were made. The court relied on the same reasoning to deny American's claims based on agency principles. The court found that, since the parties (Bivest and the Board) whose rights American claimed to assert as principal or agent, respectively, possessed no rights after they had been fully compensated for their losses (as title holder and beneficiary, respectively), American could not derivatively assert their rights. Finally, the court rejected American's claim that it was subrogated to the rights of the Board because American acted as a "volunteer" when it paid the Board for its 24,400 shares at the tender offer price, and such a volunteer cannot claim rights to subrogation. Summary judgment was therefore entered for Weyerhaeuser and First Jersey, and American appealed.
 
 II.
 
 11
 American seeks to assert the rights or claims of nonparties (i.e., the Board and Bivest) against Weyerhaeuser and First Jersey. But American lacks standing to assert such claims on its own behalf unless it is "the real party in interest." Fed.R.Civ.P. 17(a). To determine American's standing as the real party in interest, we must look to the applicable state substantive law. Dubuque Stone Products Co. v. Fred L. Gray Co., 356 F.2d 718, 723-24 (8th Cir. 1966). The district court here apparently applied Illinois law in concluding that American could not assert the rights of the Board and Bivest under principles of agency, assignment or subrogation.[10] Construing as we must the record evidence most favorably to American in reviewing a grant of summary judgment, we believe that the district court erred by concluding that American was not, under Illinois law, subrogated to the claims of the Board against the appellees.[11]
 
 
 12
 "Legal" subrogation is an equitable right which arises by operation of law and not by contract. See In re Freeman & Brooks, 1 F.2d 430 (7th Cir.), cert. denied sub nom. Alexander Lumber Co. v. Aetna Casualty & Surety Co., 266 U.S. 628, 45 S.Ct. 126, 69 L.Ed. 476 (1924); Parks v. Cadwallader, 53 Ill.App. 236 (3d Dist. 1894).[12] "Where property of one person is used in discharging an obligation owed by another ..., under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee ...." Restatement of Restitution Sec. 162 (1937); accord 4 Pomeroy's Equity Jurisprudence Sec. 1419 (5th ed. 1941). Illinois courts have stated the "[t]he doctrine of subrogation is broad enough to include every instance in which one person, not a mere volunteer, pays a debt for which another is primarily liable and which in equity and good conscience should have been discharged by the latter." Bost v. Paulson's Enterprises, Inc., 36 Ill.App.3d 135, 343 N.E.2d 168, 171-72 (2d Dist. 1976); accord King v. King, 57 Ill.App.3d 423, 15 Ill.Dec. 43, 373 N.E.2d 313 (2d Dist. 1978). Indeed, the Illinois Supreme Court has admonished us that "the policy of this court [is] to apply the expanding doctrine of subrogation, which originated in equity, and is now an integral part of the common law, in all cases where its essential elements are present, and where it effectuates a just resolution of the rights of the parties, irrespective of whether the doctrine has previously been invoked in the particular situation." Dworak v. Tempel, 17 Ill.2d 181, 161 N.E.2d 258, 263 (1959).
 
 
 13
 Notwithstanding the Illinois policy favoring a liberal application of subrogation principles, there are several requirements a potential subrogee (in this case, American) must satisfy before it may assert a right of subrogation. One such requirement (as to which there is no dispute here) is that the claim or debt under which the subrogee asserts his rights must have been paid in full. See, e.g., Medigroup, Inc. v. Schildknecht, 463 F.2d 525, 528 (7th Cir. 1972); Village of Crainville v. Argonaut Insurance Co., 81 Ill.2d 399, 43 Ill.Dec. 5, 7, 410 N.E.2d 5, 7 (1980). American purchased 24,400 of the shares tendered by the Board at the tender price, thereby paying in full whatever claim the Board or Bivest might assert.
 
 
 14
 Another requirement of subrogation is that the subrogee must have paid a claim or debt for which a third party--not the subrogee--is primarily liable either in law or equity. See, e.g., City of Hillsboro ex rel. International Insurance Co. v. Springfield Mechanical Co., 75 Ill.App.3d 154, 31 Ill.Dec. 114, 116, 394 N.E.2d 30, 32 (5th Dist. 1979). This requirement is grounded in the principle that equity will permit only parties free from wrongdoing themselves to assert rights of subrogation against third parties. See Coffey v. ABC Liquor Stores, Inc., 13 Ill.App.2d 510, 142 N.E.2d 705 (4th Dist. 1957). It is, of course, a matter of dispute whether the putative subrogee, American, or the third parties, Weyerhaeuser and First Jersey, are responsible for entering the figure "40,000" in the "Conditional Tender" box.[13] Since the parties have stipulated that this is a contested issue of fact, summary judgment based on a right of subrogation could not now be entered on the ultimate merits of American's claim. But if this factual question is resolved against the third parties, then the requirement that the claim paid was one for which a third party was primarily liable would be met.
 
 
 15
 A third requirement for proceeding by subrogation is that the subrogor must possess a right which he could enforce against a third party and that the subrogee seeks to enforce the subrogor's right. See, e.g., First National Bank v. Heatherly, 8 Ill.App.3d 1073, 291 N.E.2d 280 (5th Dist. 1972). This requirement is based upon the principle that the subrogee's rights are derived from and dependent upon the rights of the subrogor. See United States v. Greene, 266 F.Supp. 976, 979 (N.D.Ill.1967); William Aupperle & Sons, Inc. v. American Indemnity Co., 75 Ill.App.3d 722, 31 Ill.Dec. 523, 525, 394 N.E.2d 725, 727 (3d Dist. 1979). Illinois courts commonly express this needed element by saying that the subrogee must step into the shoes of, or be substituted for, the subrogor. See, e.g., London & Lancashire Indemnity Co. v. Tindall, 377 Ill. 308, 36 N.E.2d 334, 337 (1941); Dunlap v. Peirce, 336 Ill. 178, 168 N.E. 277, 282 (1929).
 
 
 16
 In the case before us there are two potential subrogors--Bivest and the Board--either of whom could have maintained an action against Weyerhaeuser and First Jersey.[14] Under Illinois law, a trustee who contracts with a third party may assert a claim either in its own name or on behalf of the trust beneficiary against the third party for breach of contract. See Village of Brookfield v. Pentis, 101 F.2d 516, 521 (7th Cir. 1939); Ennor v. Hodson, 134 Ill. 32, 25 N.E. 582 (1890); 4 A. Scott, Law of Trusts Secs. 280, 280.2, 280.6 (1967). American and its nominee, Bivest, the nominal title holder, managed the Board's account as a trust and, with respect to the 40,000 shares of tendered Weyerhaeuser stock, acted as trustees. Thus, Bivest, as a formal party to the contract, could have asserted a claim for breach of contract against First Jersey and Weyerhaeuser.
 
 
 17
 Moreover, the Board could have maintained an action against First Jersey and Weyerhaeuser because its agent, American, purported to enter into a contract with these third parties on its behalf.[15] "[W]hen a person puts his property in the hands of another to keep or manage, he creates, as between him and that other, the relation known as principal and agent." In re Mory's Estate, 17 Ill.App.3d 6, 307 N.E.2d 669, 671 (1st Dist. 1973). See generally 2 Williston on Contracts Sec. 274 (3d ed. 1959). In this case, the Board placed 40,000 shares of Weyerhaeuser stock in the hands of Bivest and American to tender pursuant to Weyerhaeuser's tender offer (which Bivest and American attempted to do). The parties here do not dispute that American and Bivest acted as the Board's agents when they tendered the stock. The Board, as the undisclosed principal of its agents, Bivest and American, could therefore have maintained an action on the contract with Weyerhaeuser. See O'Connor v. Village of Palos Park, 31 Ill.App.3d 528, 333 N.E.2d 276, 281 (1st Dist. 1975); Lake Shore Management Co. v. Blum, 92 Ill.App.2d 47, 235 N.E.2d 366, 368 (1st Dist. 1968).
 
 
 18
 Of course, the district court may ultimately determine that American (and not First Jersey or Weyerhaeuser) was in fact responsible for the rejection of the tendered shares, in which case Bivest and the Board, despite their right to sue, could not recover damages from the appellees. But, for the purpose of determining whether subrogation rights may be asserted by American, we need only conclude that either Bivest or the Board could have, in the absence of the satisfaction of their claim by American,[16] stated a claim for relief against First Jersey or Weyerhaeuser. Under the equitable doctrine of subrogation, that claim is saved for the benefit of the party (in this case, American) that made the Board whole. We conclude that both Bivest and the Board, in the absence of satisfaction by American, could have stated claims for relief against Weyerhaeuser and First Jersey, and that, since instead there has been satisfaction by American, American can now state these claims for relief.[17]
 
 
 19
 A final, and crucial, requirement for exercising the right of subrogation, which the district court found dispositive here, is that the potential subrogee must not have acted as a "volunteer" in paying a claim of the subrogor properly lying against a third party. Although Illinois courts have formulated this requirement in various ways, it may be succinctly stated as follows:
 
 
 20
 It is well settled that a mere stranger or volunteer can not, by paying a debt for which another is bound, be subrogated to the creditor's rights in respect to the security given by the real debtor. But if the person who pays the debt is compelled to pay for the protection of his own interest and rights, then the substitution should be made .... In [Bennett v. Chandler, 199 Ill. 97, 64 N.E. 1052 (1902),] it was said that "a stranger within the meaning of this rule is not necessarily one who has had nothing to do with the transaction out of which the debt grew. Any one who is under no legal obligation or liability to pay the debt, is a stranger, and, if he pays the debt, a mere volunteer."
 
 
 21
 Ohio National Life Insurance Co. v. Board of Education, 387 Ill. 159, 55 N.E.2d 163, 171, cert. denied, 323 U.S. 796, 65 S.Ct. 439, 89 L.Ed. 635 (1944). The district court concluded that American "was under no legal obligation to either Bivest or to the Illinois Board to purchase the Weyerhaeuser shares, but did so without compulsion and as a mere volunteer." Order of Sept. 10, 1981, at 8.
 
 
 22
 But this is an overly narrow interpretation of the term "legal obligation" and ignores the agency relationship between American and the Board, under which American was legally obligated to the Board. One can be subrogated to the rights of another even if the debt in question is not paid pursuant to an unconditional or fully choate requirement of law, such as might be represented by a provision of a binding contract or by a final judgment. Both the Illinois courts and federal courts applying Illinois law have not required for subrogation compulsion similar to that of a final judgment or of an enforceable contract; rather, the potential for legal liability to the subrogor, as well as the disruption of normal relations and the frustration of reasonable expectations can, in many cases, supply sufficient compulsion to support subrogation.[18] Indeed, to require an unconditional or fully choate legal liability is, to a degree, inconsistent with the nature of legal subrogation, which is not dependent upon a contract, statute or judgment but instead arises out of equitable principles as a matter of law. See supra, note 12. Rather then emphasizing the form of the legal compulsion, Illinois decisions involving rights of subrogation demand careful analysis of the nature of the relationship between the putative subrogee (American) and the subrogor (either Bivest or the Board) to determine whether the subrogee paid the debt " 'pursuant to a legal liability.' " National Cash Register Co. v. UNARCO Industries, Inc., 490 F.2d 285, 286 (7th Cir. 1974) (quoting Geneva Construction Co. v. Martin Transfer & Storage Co., 4 Ill.2d 273, 122 N.E.2d 540, 546 (1954)).
 
 
 23
 As a preliminary matter, the undisputed evidence here indicates that Bivest was established by American as its nominee to hold title to securities for customers of American's trust management services. " 'The word nominee ordinarily indicates one designated to act for another as his representative in a rather limited sense. It is used sometimes to signify an agent or trustee.' " Baum v. Sosin, 61 Ill.App.3d 394, 18 Ill.Dec. 626, 629, 377 N.E.2d 1262, 1265 (1st Dist. 1978) (quoting Schuh Trading Co. v. Commissioner, 95 F.2d 404, 411 (7th Cir. 1938)). A party appointed as nominee typically is not given " 'any property in or ownership of the rights of the person nominating him.' " Middle East Trading & Marine Service, Inc. v. Mercantile Financial Corp., 49 Ill.App.3d 222, 7 Ill.Dec. 595, 601, 364 N.E.2d 886, 892 (1st Dist. 1977) (quoting Cisco v. Van Lew, 60 Cal.App.2d 575, 141 P.2d 433, 438 (1943)). In the case before us, Bivest was apparently created solely for the convenience of American and its customers; there is no indication that American intended to transfer to Bivest any of American's rights, duties or responsibilities vis a vis its customers. We should therefore ignore Bivest and focus upon the relationship between American and its customer, the Board, to determine whether American purchased the Board's shares under legal obligation or compulsion.
 
 
 24
 We believe that the required legal obligation or compulsion must be based on American's status as an agent of its undisclosed principal, the Board, in the transfer of the stock certificates and the sending of the letter of transmittal to First Jersey. Although the district court rejected the proposition that American could maintain the instant suit as an agent, its rejection was not based on any doubt that, for the purpose of tendering the stock, the Board was a principal and American was its agent.[19] Indeed, the undisputed evidence clearly establishes a relationship of principal and agent between the Board and American since the Board transferred its property to American to manage as a trust account and directed American to tender 40,000 of the shares held in this account to Weyerhaeuser. See In re Mory's Estate, 17 Ill.App.3d 6, 307 N.E.2d 669, 671 (1st Dist. 1973).
 
 
 25
 The existence of this agency relationship suggests that American acted under a "legal obligation" when it purchased the Board's Weyerhaeuser stock. For the Board, as principal, could presumably have sued its agent, American, for the loss sustained by the Board based on the colorable allegation that American negligently (or otherwise improperly) caused the loss by failing to tender unconditionally the 40,000 shares of Weyerhaeuser stock. See Security Insurance Co. v. Mato, 13 Ill.App.3d 11, 298 N.E.2d 725, 731 (2d Dist. 1973); Thorp v. Gosselin Hotel Co., 65 Ill.App.2d 107, 212 N.E.2d 1, 3-4 (2d Dist. 1968); Shapiro v. Amalgamated Trust & Savings Bank, 283 Ill.App. 243 (1st Dist. 1935). When, as here, the agent reimburses his principal for a loss suffered by the principal for which the agent may be legally liable, the agent is entitled to be subrogated to the rights of the principal against third parties who may also, or alternatively, be legally liable for the loss. The agent, as subrogee, may sue the third parties to determine who must bear the ultimate burden of the loss.[20] Ultimate liability is, in this instance, conditional upon a determination of whose improper conduct (including negligence, if any) caused the loss.
 
 
 26
 Moreover, American may also, under Illinois trust principles, be legally liable to the Board. The Board, as beneficiary, could have brought an action against American as trustee, based on the colorable allegation that American negligently (or otherwise improperly) performed its duties with respect to the tender of stock beneficially owned by the Board. See, e.g., Continental Illinois National Bank and Trust Co. v. Roan, 617 F.2d 1217, 1221-22 (7th Cir. 1980); Wiemer v. Havana National Bank, 67 Ill.App.3d 882, 24 Ill.Dec. 428, 431-32, 385 N.E.2d 340, 343-44 (3d Dist. 1978). See generally 3 A. Scott, Law of Trusts Sec. 209 (3d ed. 1967). Because American as either an agent or a trustee could be reasonably charged with legal liability to the Board for the improper tender of the Board's Weyerhaeuser stock, we believe that American purchased the Board's stock under "compulsion" and under a "legal obligation," entitling American to exercise rights of subrogation.[21] See In re Federal Facilities Realty Trust, 220 F.2d 495 (7th Cir. 1955).
 
 
 27
 It would serve no purpose to deny standing to American in this case. First, a loss was suffered by the Board because the tender of its stock was rejected. But the Board is not responsible for that loss.[22] Rather, it appears that the loss was caused by one or more of several other parties--American, First Jersey, or Weyerhaeuser--each or all of whom could be sued by the Board for the loss. Under the facts of this case, it makes sense that the innocent party be made whole now for its losses by the one of the potential wrongdoers who was its agent; subsequently this reimbursing party should be authorized to institute suit to determine who, among the three potential wrongdoers, should in equity be required ultimately to bear the loss. To frustrate this result by invocation of the "volunteer" doctrine may result in the one clearly innocent party (here the Board) needlessly bearing the heavy costs and enduring the uncertainties of litigation.
 
 
 28
 Second, the historical concerns which underlie the volunteer rule are not present in this case. These concerns were best summarized in Hult v. Ebinger, 222 Or. 169, 352 P.2d 583, 592 (1960), as follows:
 
 
 29
 It has been suggested that the origins of the "volunteer" rule are in the individualistic bent of the English national character and in the common law regard for privity of contract.... The rule has been traced to the case of Grymes v. Blofield, Cro.Eliz. 541 (1598), which held that a debt could not be satisfied by a stranger, and more generally to the fear of champerty and maintenance which found expression in the early common law restricting the assignability of choses in action.... It is obvious that the modern practice which permits free alienability of choses has robbed the "volunteer" rule of much of its rational justification.
 
 
 30
 See also Hope, Officiousness, 15 Cornell L.Q. 25, 29 (1929). Privity of contract is a concern which we have already dealt with under the rubric of real party in interest. Concerns about champerty and maintenance are not relevant here.
 
 
 31
 Finally, to deny American standing in this case by some formalistic application of a volunteer rule would be inconsistent with the purpose of equity: to secure substantial justice. The Illinois courts, in recognition of this goal, have expressly broadened the area in which the remedy of subrogation is available. See Dworak v. Tempel, 17 Ill.2d 181, 161 N.E.2d 258, 263 (1959).
 
 III.
 
 32
 American also argues that the district court erred by denying its motion for partial summary judgment on the question of damages, if Weyerhaeuser and First Jersey are later found to have improperly rejected the tender. The district court, having found that American was not a proper party, did not discuss the issues related to its summary judgment motion on damages. Although we might normally ignore these issues until the district court considers them on remand, we believe that, in the interests of expedition, we should address these questions now. Both sides have fully briefed and argued them, and the facts and law relating to them are developed in the record and are relatively straightforward.
 
 
 33
 American moved for partial summary judgment contending that its damages should be measured by the difference between the price it paid the Board for the 24,400 shares of Weyerhaeuser stock and the price received for the stock when the shares were sold on September 21. Weyerhaeuser responded by contending that, if its motion for summary judgment on standing were denied, then the measure of American's damages (if Weyerhaeuser and First Jersey improperly rejected the tender) would be the difference between the price American paid the Board for the 24,400 shares of Weyerhaeuser stock and the market price of the stock on September 7, the same day American purchased the stock. In the alternative, Weyerhaeuser argued that, if American's measure of damages is accepted, summary judgment is precluded because there are material issues of fact concerning the reasonableness of American's efforts to mitigate damages. We think that, under Illinois law, American's damages are measured by the difference between the price paid American for the stock and the price it received for the stock on September 21 and that American is entitled to partial summary judgment.
 
 
 34
 We note at the outset that American's action is limited to the recovery of damages rather than of the price because the buyer (Weyerhaeuser) rejected American's tender and returned the shares to American. Although transactions in securities are normally governed by article 8 of the Illinois Uniform Commercial Code, the provisions of article 8 set out standards that apply only to an action for recovery of the sale price. See ILL.REV.STAT. ch. 26, Sec. 8-107(2) (1981).[23] Thus, for rules applicable to a case where damages is the proper remedy because the securities tendered have been rejected, returned and resold, we must look to ILL.REV.STAT. ch. 26, Sec. 2-706 (1981) (pertaining to the sale of goods). See Bache & Co. v. International Controls Corp., 339 F.Supp. 341, 349 (S.D.N.Y.), aff'd on opinion below, 469 F.2d 696 (2d Cir. 1974).[24]
 
 
 35
 ILL.REV.STAT. ch. 26, Sec. 2-706(1) (1981), provides that a seller may, upon the buyer's wrongful refusal to accept delivery, resell undelivered or returned goods. The damages recoverable by such a seller who resells, "if the resale is made in good faith H and in a commercially reasonable manner," is "the difference between the resale price and the contract price." ' ILL.REV.STAT. ch. 26, Sec. 2-706(1). Applying section 2-706(1) to the facts of this case, the measure of American's damages is the difference between the tender offer price of $32.00 per share and the price received by American when it resold the stock on September 21, provided, of course, that the resale was commercially reasonable and made in good faith.
 
 
 36
 In support of its contention that damages must be measured by the market price for Weyerhaeuser stock on September 7 rather than the price for which it was sold on September 21, Weyerhaeuser argues that, consistent with the principles of subrogation, American is entitled "to reimbursement to the extent of money actually paid or the value of property applied to discharge an obligation." Appellee's Br. at 25. According to Weyerhaeuser's theory, American should have "liquidated" its claim on September 7 by a simultaneous resale to avoid "speculation" on the price of Weyerhaeuser stock; any losses occurring after September 7 are argued to be chargeable to American's "speculation" rather than to a failure to complete the sale under the tender offer. But we are unwilling to impose a requirement of immediate resale because the seller's agent has reimbursed his principal and is proceeding by right of subrogation. Weyerhaeuser's concerns about "speculation" must be considered as challenges to the good faith reasonableness of American's resale; and these concerns do not demand as a matter of law that the damages be measured at a date preceding the date when the stock is actually resold. Moreover, a literal reading of the reimbursement principle favored by Weyerhaeuser ("reimbursement to the extent of money actually paid") does not support its argument for requiring a sale on September 7. The "money actually paid" principle seems to point to the actual loss without regard to the possibility of mitigation. But, by imposing the requirements of good faith and commercial reasonableness, the law does in fact require reasonable attempts to mitigate damages. See Bache, 339 F.Supp. at 349-52.
 
 
 37
 The evidence here seems straightforward and persuasive as to meeting the requirements of good faith and commercial reasonableness. American contacted Weyerhaeuser to persuade Weyerhaeuser to accept the tender on either September 7 or September 8. Mr. Vandevert, acting as Weyerhaeuser's representative, did not dismiss outright American's effort to persuade him to rescind the rejection. Instead, Mr. Vandevert told American that he would investigate the matter if American sent him the necessary background papers (which American did).[25] Weyerhaeuser then delayed for almost two weeks before informing American that the rejection would not be rescinded and the tender accepted. American, after receiving Weyerhaeuser's response, immediately sold the shares.
 
 
 38
 Under these circumstances we do not perceive any genuine issues of material fact involving American's good faith in holding the 24,400 shares of Weyerhaeuser stock until September 21. Weyerhaeuser asserts that American held the stock as a speculation for its own account because, as American admits, it regarded Weyerhaeuser stock as a good investment. But American's purpose was clearly not to buy 24,400 shares of Weyerhaeuser stock for speculation or investment for its own account; the uncontroverted evidence is that American bought these shares to make the Board whole, and then attempted to persuade Weyerhaeuser to accept the shares under the tender offer. American presumably would not have asked Weyerhaeuser to accept the tender of the stock if American's main purpose was speculation. Moreover, Weyerhaeuser, by asking for time to investigate, must share at least part of the responsibility for American's delay in selling the stock. American reasonably inferred from Weyerhaeuser's request for time to consider that Weyerhaeuser might reverse its rejection of the tender. We cannot find on this record any genuine issue as to American's good faith.
 
 
 39
 Similarly, we believe that the commercial reasonableness of American's actions is clear. As stated by the Bache court, "there is still no clearcut or easily identifiable rule as to what constitutes a commercially reasonable time. One can only say that the resale should be made as soon as practicable after the breach of the tender offer and the seller should make every reasonable effort to minimize the loss." 339 F.Supp. at 352. Under the circumstances present in Bache, the court found that thirty days from the date of the breach of the tender offer was a commercially reasonable time for expecting the seller to resell the securities. Cf. Reynolds v. Texas Gulf Sulphur Co., 309 F.Supp. 548, 563 (D. Utah 1970), aff'd in part, rev'd in part sub nom. Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90 (10th Cir.), cert. denied, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971) (nine days as reasonable resale period for determining damages in Rule 10b-5 case). In the case before us, it was not unreasonable for American to hold the stock for two weeks. Although the market price for Weyerhaeuser stock was slowly falling during the period from September 7 to September 21, the decline in price (from a mean price per share of $30.625 to $29.25, a decline of $1.50 or approximately 5%) does not suggest that it was unreasonable to hold a large block of shares during that period. Moreover, we think it might have been commercially unreasonable for American to have promptly sold the shares after requesting Weyerhaeuser to investigate and reconsider the tender offer.[26] American is entitled to partial summary judgment on its claim that the proper measure of damages is $69,912.25, based on the difference between the price American paid for 24,400 shares of Weyerhaeuser stock and the price received by American on September 21 when it sold these shares.[27]
 
 IV.
 
 40
 The grant of summary judgment in favor of First Jersey and Weyerhaeuser is reversed. The denial of partial summary judgment in favor of American is reversed. The case is remanded to the district court with directions to enter an order granting partial summary judgment to American and for further proceedings consistent with this opinion.[28]
 
 
 41
 REVERSED AND REMANDED.
 
 
 
 *
 The Honorable George Templar, Senior District Judge for the District of Kansas, is sitting by designation
 
 
 [1]
 See Preliminary Pre-Trial Order, No. 79-C-332 (Feb. 9, 1981), reproduced in Appellee's Supp.App. at 17-29
 
 
 [2]
 The letter was a form letter prepared for this purpose and supplied to American by Morgan Stanley & Co., the Dealer Manager for the offer by Weyerhaeuser
 
 
 [3]
 First Jersey interpreted the entry of the figure "40,000" in the "Conditional Tender" box to mean that Bivest, as the title holder of the shares, tendered 40,000 shares with the added requirement that Weyerhaeuser accept all 40,000 as the minimum number of shares Weyerhaeuser would purchase
 
 
 [4]
 The purchase was later confirmed by letter from American to the Board
 
 
 [5]
 It is unclear from the record whether American contacted First Jersey before or after American purchased the 24,400 shares of Weyerhaeuser stock from the Board since the parties stipulated only that American's vice-president contacted First Jersey "on or before" September 8
 
 
 [6]
 In fact, Vandevert had mailed his response to American on September 18, but American did not receive it until September 21
 
 
 [7]
 The high, low and mean prices per share of Weyerhaeuser stock on September 7, 1978, were $31.00, $30.25 and $30.625, respectively. Using the mean price, the total damages under Weyerhaeuser's theory would be approximately $33,550.00
 
 
 [8]
 Bivest assigned its claims against Weyerhaeuser and First Jersey to American on January 23, 1979, several months after American had made the Board whole for the rejected tender
 
 
 [9]
 The Board assigned its claims against Weyerhaeuser and First Jersey to American on February 27, 1981, more than two years after American had made the Board whole for its losses
 
 
 [10]
 Neither the parties on appeal nor the district court in its order addressed the question of the applicable state law. Invoking Illinois conflict of laws principles (the law of the forum) as required by Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), we believe that an Illinois court would apply Illinois substantive law to the various issues related to the alleged breach of contract here. It is particularly appropriate to apply Illinois law in this case since the place of execution and performance of the contract (or contracts) at issue could be one of several states (e.g., Illinois, New Jersey or Washington) but the state with the most significant contacts to the transaction is Illinois. See P.S. & E. Inc. v. Selastomer Detroit, Inc., 470 F.2d 125, 127 (7th Cir. 1972); Ehrman v. Cook Elec. Co., 468 F.Supp. 98, 99 (N.D. Ill. 1979)
 
 
 [11]
 Although our analysis focuses on American's rights of subrogation, we must also discuss and decide several issues in this case involving American's rights under principles of assignment and agency. Although we have tried to avoid deciding questions not essential to our disposition of this case, we must address a number of the assignment and agency issues since, in the context of this case, subrogation necessarily overlaps and implicates aspects of the law of agency and assignment
 
 
 [12]
 Subrogation which is grounded in equity and applied as a matter of law is typically denominated "legal" subrogation. On the other hand, subrogation that is founded upon an express or implied agreement (e.g., on an insurance contract where the insurer is subrogated to any recovery for injuries received directly from a tortfeasor) is termed "conventional" subrogation. See Bost v. Paulson's Enterprises, Inc., 36 Ill.App.3d 135, 343 N.E.2d 168, 172 (2d Dist. 1976). Various equitable principles, such as the denial of subrogation to a volunteer or to a subrogee who has not paid the claim in full, are not applicable to conventional subrogation. See 73 Am.Jur.2d Subrogation Sec. 2, at 599 (1974). In this case, we are concerned only with legal subrogation as defined in equity and which arises by operation of law. There is no evidence of an express or implied agreement for subrogation among any of the parties whose claims are at issue here. The lack of an express or implied agreement between American and Weyerhaeuser concerning American's purchase of Weyerhaeuser stock from the Board also precludes a cause of action under the doctrine of assumpsit for money paid. See Bishop v. O'Conner, 69 Ill. 431 (1873); King v. Hannah, 6 Ill.App. 495 (3d Dist. 1880)
 
 
 [13]
 We believe that the answer to this question will necessarily answer the question whether Weyerhaeuser and First Jersey properly rejected American's tender on behalf of the Board
 
 
 [14]
 The district court concluded as much when it stated that "[t]here is no question but that Bivest and the Illinois Board suffered a wrong when the shares were rejected. A real dispute does exist as to who or what organization is responsible for the offer being rejected ...." Order of Sept. 10, 1981, at 6-7. However, the district court misconstrued the import of this conclusion when it erroneously determined that subrogation was not available to American
 
 
 [15]
 The principal/agent relationship between the Board and American is discussed in detail infra
 
 
 [16]
 Appellees argue, and the district court agreed, that neither Bivest nor the Board could have maintained actions because they were made whole by American's purchase of 24,400 shares. But this argument, if accepted, would effectively eliminate all rights of subrogation since subrogation requires that the subrogor be made whole for his losses. When determining whether the subrogor could have maintained an action, we look at the hypothetical suit the subrogor could have brought. The subrogee asserts the cause of action which the subrogor, but for his receipt of payment in full, could have brought. "Subrogation presupposes an actual payment and satisfaction of the debt or claim to which the party is subrogated, although the remedy is kept alive in equity for the benefit of the one who made the payment under circumstances entitling him to contribution or indemnity ...." Remsen v. Midway Liquors, Inc., 30 Ill.App.2d 132, 174 N.E.2d 7, 12 (2d Dist. 1961)
 
 
 [17]
 Our conclusion on this point is not affected by the purported assignments given to American by the Board and Bivest. As appellees point out, assignment and subrogation are not only distinct but also inconsistent legal remedies when applied to the claims which Bivest and the Board could have asserted in this case. Subrogation secures only the rights of contribution and indemnity; the debt or claim to which the subrogee is subrogated has been paid by the subrogee but the remedy is kept alive in equity for the benefit of the subrogee. An assignment, on the other hand, presupposes that the debt or claim has not been paid; the entire claim is transferred to another party who then prosecutes the claim in the assignor's stead. See Bernardini v. Home & Auto Ins. Co., 64 Ill.App.2d 465, 212 N.E.2d 499, 501 (1st Dist. 1965); Remsen v. Midway Liquors, Inc., 30 Ill.App.2d 132, 174 N.E.2d 7, 12-13 (2d Dist. 1961). In this case, then, it is clear that the Board and Bivest could not have "assigned" their claims to American because those assignments were executed after American had made the Board whole for its losses. But the invalidity of the assignments does not affect American's right of subrogation since legal subrogation arises independent of any contract and as a matter of law when one pays the debt of another. Cf. Mobile Constr. Co. v. Phoenix Ins. Co., 119 Ill.App.2d 329, 256 N.E.2d 149 (5th Dist. 1970) (plaintiff paid debt on note executed by third party, then secured "assignment" from maker of note of all its rights; held, plaintiff could sue insurance company as subrogee of maker of note to recover under fire insurance policies naming maker as beneficiary). See also Hult v. Ebinger, 222 Or. 169, 352 P.2d 583, 590-91 (1960)
 
 
 [18]
 Particularly instructive in this respect is the decision in Hough v. Aetna Life Ins. Co., 57 Ill. 318 (1870). In Hough, the general agent of an insurance company paid premiums owed the company by a local agent. Although noting that both the local and the general agent were contractually liable to the company for these premiums, the Illinois Supreme Court did not base its conclusion that the general agent was subrogated to the company's rights solely on his contract-based liability. Rather, the court stated that the general agent's "liability arose, not only by contract, but from his relation to the company, and to the local agents, and his right to appoint them. His reputation was involved, and his position could alone be maintained by the regular monthly payment of all sums received by the local agents." 57 Ill. at 320 (emphasis supplied). These factors--contract, reputation and job security--demonstrated that the general agent "acted under compulsion" and that "[t]here was nothing voluntary about" the payments. 57 Ill. at 321; accord American Commercial Lines, Inc. v. Valley Line Co., 529 F.2d 921, 924 (8th Cir. 1976) (possibility of personal and in rem liability for damage caused by another held sufficient for subrogation). Many other decisions applying Illinois law demonstrate that subrogation is available in circumstances where the subrogee pays the claim even in the absence of clearcut liability (or even when there is no liability) on his part for the claim. See, e.g., Pennwalt Corp. v. Metropolitan Sanitary Dist., 368 F.Supp. 972 (N.D. Ill. 1973) (possibility of legal liability under Illinois law for taxes, paid in absence of compulsion or legal proceedings but actually owed by another party, held sufficient for subrogation); National Cash Register Co. v. UNARCO Indus., Inc., 490 F.2d 285, 286-87 (7th Cir. 1974) (where plaintiff played role in procuring contract between his contractor and defendant subcontractor, and then procured materials when defendant subcontractor breached contract, held sufficient in equity for plaintiff to proceed as subrogee of his contractor); Bridewell v. Board of Educ., 2 Ill.App.3d 684, 276 N.E.2d 745, 750-51 (5th Dist. 1971) (where teacher sued school district and teacher's insurer paid teacher's attorney fees notwithstanding statute requiring school district to pay attorney fees, held insurer subrogated to teacher's right under that statute); King v. King, 57 Ill.App.3d 423, 15 Ill.Dec. 43, 45, 373 N.E.2d 313, 315 (2d Dist. 1978) (wife paid attorney fees even though divorce decree required husband to pay such fees; held, wife entitled to reimbursement from husband under subrogation principles). See also Chaplin v. Merchants Nat'l Bank, 186 F.Supp. 273 (N.D. Ill. 1960)
 
 
 [19]
 Instead, the district court only determined that American could not sue as an agent on behalf of its principal because the principal had been paid in full and thus had no claim for damages. But we think that American in its own right (assuming injury) might have maintained an action against Weyerhaeuser and First Jersey. Under Illinois law the agent of either a partially disclosed or an undisclosed principal may bring suit in his own right against third parties because "he binds himself to the third party with whom he acts as if he, himself, were the principal." Rosen v. DePorter-Butterworth Tours, Inc., 62 Ill.App.3d 762, 370 N.E.2d 407, 410 (3d Dist. 1978); accord Lake Shore Management Co. v. Blum, 92 Ill.App.2d 47, 235 N.E.2d 366, 368 (1st Dist. 1968). Since the agent need not bring suit on "behalf" of his principal, we do not believe that the agent's suit is necessarily barred even if he has previously reimbursed the principal for the latter's losses. In any event, the district court's conclusion that American could not sue as an agent is based solely upon the fact that American had paid the Board's claim. As we have discussed in note 16, supra, we determine subrogation rights based upon whether the subrogor could have sued the third parties for its losses; this determination is made hypothetically by ignoring that the subrogor was actually reimbursed and, thus, might not in fact be able to maintain such a suit at the particular point in time that the subrogee files suit
 
 
 [20]
 Subrogation in favor of an agent making good a loss to his principal has been allowed under various circumstances, as where, in discharge of his obligations as agent, he uses his own funds to protect the principal's estate, property or interests, or to make good a loss to the principal resulting from dealings with third persons .... The fact that an agent was negligent in causing loss to his principal will not defeat his right to subrogation
 
 
 [73]
 Am.Jur.2d Subrogation Sec. 52, at 630-31 (1974) (footnotes omitted)
 
 
 [21]
 The Illinois authorities relied upon by appellees do not persuade us to the contrary. In re Dickson's Estate, 316 Ill.App. 599, 45 N.E.2d 558 (1st Dist. 1942), denied subrogation to a mother who paid the bill for the funeral of her child at the request of the administrator of the child's estate. But the appellate court's opinion, which is devoid of any reasoning on the subrogation claim, conflicts with another Illinois decision allowing a third party to recover his payment of a decedent's funeral expenses under principles of equity in a similar case, see Christenson v. Board of Charities, 263 Ill.App. 380 (1st Dist. 1929), and is also in conflict with the general rule that a person not acting officiously who in a reasonable manner and in good faith pays a funeral bill for another is not a volunteer and is entitled to subrogation. See 35 A.L.R.2d 1399, 1406-07, 1410-12 (1954). Even if In re Dickson's Estate is good law in Illinois, it is distinguishable from the case before us since the mother was under no potential legal obligation to the funeral provider whereas American here paid in light of its potential liability to the Board as American's principal and trust beneficiary. The case of Bennett v. Chandler, 199 Ill. 97, 64 N.E. 1052 (1902), where the agent of a mortgagee, charged with collecting payments from the mortgagor, made payments on behalf of the mortgagor when the latter defaulted is quite distinguishable. The agent owed no duty to the mortgagor to make these payments and indeed, the agent did not even notify either the mortgagor or the mortgagee that he had made the payments. See also Lakeview Trust & Sav. Bank v. Rice, 279 Ill.App. 538 (1st Dist. 1935). In the instant case, on the other hand, American owed a clear duty to its principal and trust beneficiary, the Board, to carry out instructions in a non-negligent manner, and the Board might colorably allege that, under these facts, American had breached its duty. Finally, in Sher v. Robin, 53 Ill.2d 301, 291 N.E.2d 801 (1972), defendant sold his business to plaintiff but when plaintiff subsequently incurred a debt with an advertising agency, the defendant paid the plaintiff's debt after the agency presented the bill to defendant. The Illinois Supreme Court denied subrogation to the defendant because "[t]he defendant had no legal obligation to pay the liabilities incurred by [the business] after the plaintiff became its owner." 291 N.E.2d at 805. In reaching this conclusion, the court apparently determined that a prior contract between defendant and the advertising agency, under which the defendant assumed personal liability for the advertising expenses of the business, did not legally bind defendant after the sale. In the case before us, on the other hand, binding legal relationships of agency and trust between American and the Board existed at the time American purchased the Weyerhaeuser stock. Further in Sher, the Illinois Supreme Court apparently determined as a matter of law that the defendant was not liable under the contract. Unlike the instant case, no arguable state of facts in Sher could apparently have changed the result so as to impose ultimate liability on the defendant
 
 
 [22]
 The preliminary pretrial order designates the question whether the Board instructed American to make an unconditional tender of the shares as a contested issue of fact, but any implications which might be drawn from this designation have not been argued and are not before us on this appeal. See Preliminary Pretrial Order No. 79-C-332 (Feb. 9, 1981), reproduced in Appellee's Supp.App. at 24. Neither the district court nor any party to this appeal has questioned here that the Board is an innocent injured party
 
 
 [23]
 ILL.REV.STAT. ch. 26, Sec. 8-107(2) (1981), which adopts verbatim U.C.C. Sec. 8-107 (1962), provides that the seller may recover the price of the securities if the buyer has accepted tender of the securities or there is no market in which the securities may be resold. These standards are not appropriate here since Weyerhaeuser rejected the tender and returned the shares to American. However, the commentary accompanying Sec. 8-107 indicates that the section was intended to codify the dictum of Agar v. Orda, 264 N.Y. 248, 190 N.E. 479 (1934), a pre-U.C.C. case. See ILL.REV.STAT.ANN. ch. 26, Sec. 8-107 (1974) (commentary of W. Davenport and L. Coles, Jr.); U.C.C. Sec. 8-107 (1962) (Perm. Ed. Bd. Comment). In Agar, the New York Court of Appeals held, under the statutory predecessor of the U.C.C., that where the buyer of shares of stock refused to accept delivery of tendered shares, the seller was limited to an action to recover damages just as in the typical case where a buyer of goods refuses to accept the seller's tender. Illinois decisions concerning sales of stock prior to the enactment of the U.C.C. are in accord with Agar. See Osgood v. Skinner, 211 Ill. 229, 240, 71 N.E. 869 (1904) (noting that one of seller's remedies is for seller to sell stock and recover, as damages, the difference between contract price and sale price). In the absence of any current Illinois decision or statute to the contrary, we believe Illinois would follow the general rule as expressed in Agar and in the (albeit unofficial) commentary accompanying the Illinois version of the U.C.C. We do not believe that Illinois intended to limit recovery solely to cases where an action for the price can be maintained (because the buyer retained the tendered shares). See ILL.REV.STAT. ch. 26, Sec. 1-103 (1981) (preserving other principles of law and equity to supplement the U.C.C.)
 
 
 [24]
 The Bache court did not hesitate to look to the New York version of the U.C.C. Sec. 2-706 because New York courts had continued to follow the rule of Agar and applied article 2 (which ostensibly governs sale of goods) to sales involving securities even though a security is excluded from the definition of "goods" in U.C.C. Sec. 2-105. See 339 F.Supp. at 349. Unfortunately, Illinois has, to our knowledge, failed to produce a reported case applying (or refusing to apply) ILL.REV.STAT. ch. 26, Sec. 2-706 to sales involving securities. Since there is an apparent gap in Illinois law on this subject, we believe that an Illinois court faced with this question would follow the lead of New York and the Bache case
 Moreover, the principles we apply from Bache to this case do not turn on the different statutory language found in the New York counterpart to ILL.REV.STAT. ch. 26, Sec. 8-107. New York, unlike Illinois, allows, as an alternative to an action for damages consistent with U.C.C. Sec. 2-706, an action for the sale price of stock even if the tendered stock has been returned. We have not adopted that rule since Illinois Sec. 8-107 clearly does not admit of this result. Rather, we have simply borrowed the reasoning from Bache that, in a damage action, it is proper to look to the standards of Sec. 2-706 even though securities, rather than goods, are involved.
 
 
 [25]
 Weyerhaeuser argues that Vandevert did not give any indication to American that Weyerhaeuser might accept the tender offer after he reviewed the facts. But American could and did reasonably interpret Vandevert's decision to consider American's claim to mean that Weyerhaeuser might later accept the tender. We do not believe Weyerhaeuser had to give prior assurances that it might or would change its decision in order for American to reasonably rely on this inference
 
 
 [26]
 We can only speculate, but we suspect that if Weyerhaeuser stock had risen in price after September 7 and American had sold on that date, Weyerhaeuser would now argue that American should not have sold on September 7 but instead should have waited to receive Weyerhaeuser's final response to the request to accept the tender
 
 
 [27]
 Although not raised by the parties on appeal, we also believe that American satisfied the "notice" requirement of ILL.REV.STAT. ch. 26, Sec. 2-706(4)(b) (1981), by selling the shares on a national securities exchange. See Bache & Co. v. International Controls Corp., 339 F.Supp. 341, 352 (S.D.N.Y.), aff'd on opinion below, 469 F.2d 696 (2d Cir. 1972)
 
 
 [28]
 Consolidated with this appeal is the separate appeal of Weyerhaeuser from the district court's order dismissing Weyerhaeuser's third-party complaint against First Jersey on grounds of mootness. Because of the disposition we have reached here, the district court's order dismissing the third-party complaint must be reversed